W. R. WRAPE STAVE COMPANY *v.* ARKANSAS STATE GAME & FISH COMMISSION.

4-8849                                                              219 S. W. 2d 948

Opinion delivered May 2, 1949.

230

*D. K. Hawthorne, Wootton, Land & Matthews, Elbert Cook, Watson, Ess, Whittaker, Marshall & Enggas,* and *Armistead, Rector & Armistead,* for appellant.

*Ike Murry,* Attorney General, *Jeff Duty,* Assistant Attorney General, *Oscar Ellis, Neill Bohlinger, Clark & Clark, Russell Roberts,* and *Ed E. Ashbaugh,* for appellee.

GRIFFIN SMITH, Chief Justice. The State Game and Fish Commission sought by Circuit Court action to con-

demn lands in Faulkner County for a game and fish reserve, under authority of Amendment No. 35 to the Constitution. By construction of a dam across Palarm Creek a lake covering between six and seven thousand acres would be created at a maximum elevation of 261 feet above sea level. The creek, sluggish in dry weather, accounts for a swampy area not reasonably adaptable to agriculture, but yielding commercial timber, such as oak, pine, etc. In addition to the property to be inundated, a margin of twenty feet bordering the shoreline would be included, all in designated sections of Townships Four and Five North, Range Thirteen West. The complaint listed sixty tracts and 132 defendants, of whom but three have contested court action—W. R. Wrape Stave Company, Dierks Lumber and Coal Company, and Magnolia Pipe Line Company.

Wrape's holdings include 160 acres from which all of the timber has been taken, and 700 acres of partly cut land. The property is not for sale and no definite value was stated, although $10 per acre might be a fair price for the cutover acreage. Dierks owns 680 acres purchased in 1946 and 1947 for $21,800. It was thought to be worth $25,000 for timber and growing purposes.

Magnolia Pipe Line Company has projected a twenty-inch line from Texas to Illinois, beginning at Corsicana, traversing Arkansas, and terminating near Patoka, in Marion County, Ill.

In a joint action by Wrape, Dierks, and Magnolia, the condemnation suit was removed to Federal Court, but was remanded upon determination by Judge Lemley that in respect of the relief sought, the Commission was the State, and the State, acting in its sovereign capacity, is not a "person" within the Act of Congress. Jud. Code, § 28, 28 U. S. C. A., § 71. *Arkansas State Game and Fish Commission* v. *W. R. Wrape Stave Co., et als*, 76 Fed. Sup. 323. On remand the defendants alleged equitable defenses not cognizable at law, and the causes were transferred to Chancery on petition for injunctions and on cross-complaints.

Allegations were (a) that condemnation was not authorized for the purposes contemplated, (b) the Com-

mission was not the real party in interest, (c) funds were not available to finance the undertaking or to pay damages, (d) Conway sewage would contaminate the lake and destroy fish, (e) no effort was made in any case to acquire property by purchase or gift, (f) maps were not filed, (g) the Commission's resolutions authorizing the project were insufficient, and (h) "Where land has been devoted to a public use, [as in case of rights acquired by the Pipe Line Company] it may not be subjected to subsequent condemnation for another public use which would impair its first use, in the absence of constitutional or statutory authority, either expressed or necessarily implied."

Five express findings were made by the Court, upon which the decree dismissing the cross-complaints for want of equity was predicated: (1) On the issue of authorized purpose—that is, whether Amendment No. 35 intended that Commission funds should be spent for a preserve such as was indicated by the Palarm dam, and whether property involved could be taken by condemnation—the Chancellor said the only testimony was that of T. A. McAmis, Executive Secretary of the Commission, who in all respect verified the contention that the end sought was ". . . for the conservation of birds, fish, game, and [other] wild life, and to create a recreational area for use of the citizens of the State at large." (2) That at a pre-trial conference May 29 it was determined that the Commission was the real party. (3) The cross-complaint could not, as a defense to the Commission's proposal to condemn, question the source from which payments would come. (4) The Court would assume good faith upon the part of Conway municipal authorities in pledging an appropriate diversion of sewage, to the end that contamination of the lake would not occur. (5) Section 4994 of Pope's Digest relating to negotiations in an effort to agree upon easements, applies to railroad, telegraph, and telephone companies, "or a pipe line company."

The Commission, said Judge Ward, had been importuned by many citizens of Faulkner and Pulaski Counties, who urged that the preserve be established,

and "interested representatives" of local groups had acted for the Commission, relieving it of the imputed duty of negotiating, since the contracts so made took the place of direct action by the Commission. The Court was not convinced that Magnolia was a common carrier devoted to public service of a character preventing the State from condemning, for concurrent use, land over which the pipe line passed, hence a subsequent grant in the circumstances shown would not destroy the primary right, or impair appellant's property in a way not compensable in damages.[1]

*First—Amendment No. 35.*—The underlying purpose seems to have been (§ 1) to vest in the Commission "The control, management, restoration, conservation, and regulation of birds, fish, game, and wild life resources of the State." Funds arising from all sources, including the sale of property, (§ 8) shall be expended by the Commission ". . . for the control, management, restoration, conservation, and regulation of bird, fish, and wild life, . . . including the purchases or other acquisitions of property for said purposes and for the administration of the laws pertaining thereto, and for no other purpose. [The Commission shall have the power] to acquire by purchase, gifts, eminent domain, or otherwise, all property necessary, useful or convenient . . . in the exercise of any of its duties, and in the event the right of eminent domain is exercised, it shall be . . . in the same manner as now or hereafter provided for the exercise of eminent domain by the State Highway Commission."

The Highway Commission, (Pope's Digest, § 6593) if it condemns, must proceed in the manner provided for railroad, telegraph, and telephone companies. Act 71 of 1929.

The Game and Fish Commission is given a very broad discretion in determining how wild life shall be conserved. Not only may it acquire, by condemnation or

---

[1] By § 5081 of Pope's Digest, pipe line companies are given the right of eminent domain. Procedure for exercising the right is the same as that prescribed for railroad, telegraph, and telephone companies. Ark. Stats. (1947) §§ 73-1901-2.

otherwise, the property actually needed, but it may also procure any that may be *"useful or convenient . . .* in the exercise of any of its duties"; and, while in matters of mere convenience the power would not be unlimited, yet the intalicized words serve to emphasize a plan by those who framed the Amendment—a bilateral purpose to conserve wild life, and to place that duty with the Commission. Although appropriations must come from the General Assembly, money received from sources mentioned in the Amendment is not available— even with legislative approval—for any uses other than those expressed or necessarily implied; and the Commission determines what property is needed.

In the case at bar it is insisted that sportsmen from Conway and Little Rock, for reasons of personal convenience, have promoted the project, and that in yielding to importunities by these groups the Commission has not acted for the best interests of all of the people. This conclusion, appellants intimate, finds support in the fact that Federal agencies, when approached by representatives of the Conway Chamber of Commerce, refused to participate in this or similar ventures, thus inferentially saying the refuge was not a public necessity within the meaning of Amendment 35, or that plans for construction of the dam, when considered in connection with flowage costs, rendered the venture impracticable.

But the Commission's duties, and its right of determination, are not to be measured by mere doubt-creating suggestions; and an unnamed agency's failure to assist falls short of being proof that the Commission's purposes are ill-conceived.

By resolution[2] the Commission first set aside $65,000—a sum it subsequently concluded was insufficient; so in June 1948 the allocation was increased by $10,000. This, said Mr. McAmis in testifying, was intended as the State's full expenditure for acquisition of the property and construction of the dam. A voucher for $40,000 was drawn against the $75,000 allotment and paid into the Court registry to compensate damages for

[2] The resolutions passed by the Commission were not formal. Action of that body is reflected by the approved minutes.

property that might be taken. This left $35,000 of the "ear-marked" fund for use in building the dam—an undertaking formerly estimated at $65,000. However, said McAmis, "The Commission can [set aside for this project] additional money at any time it is needed."

It was shown that a new appropriation ($300,000 for each year of the biennium ending June 30, 1951) had been made by the Fifty-Seventh General Assembly to purchase lands "in areas suitable for public hunting, public fishing," and kindred activities.

A stressed point in appellants' argument is that failure of the Commission to strictly comply with Act 271 of 1941 requires reversal of the judgments. The Act provides that condemnation shall be in the name of the State for use of the Game and Fish Commission, ". . . and before any such suit can be brought it shall be necessary for the Commission to unanimously pass a resolution to that effect, setting forth the necessity and purpose for which the land is to be condemned, together with the legal description of the lands sought to be condemned. A copy of the resolution shall be transmitted to the Prosecuting Attorney of the district in which the land is situated, and it shall be the duty of the Prosecuting Attorney to institute proper proceedings for the condemnation of such lands." Another requirement of the Act (§ 3) is that "Before any such action may be maintained it must appear that the General Assembly has made adequate appropriation which is available at the time the suit is filed with which to pay damages assessed by the jury for the taking of such land."

Appellee contends—and correctly, we think—that Amendment 35 is complete within itself, and that prior legislative Acts, whether directive or restrictive in nature, have been superseded. It seems to have been the purpose of those who wrote the Amendment to cover the whole subject, and to either provide, or leave to the Commission, methods for reaching these ends. See *Adams* v. *DeWitt Special School District*, 214 Ark. 771, 218 S. W. 2d 359.

In support of their belief that cross-complaints were erroneously disposed of, appellants point to what they term legislative attempts, by Act 207 of 1947, to provide funds for the Commission's use in purchasing lands. The language, they say, is too general, hence—for want of specific allocation—the mandate of Art. 5, § 29, of the Constitution, has not been complied with. *Director of the Bureau of Legislative Research* v. *MacKrell*, 212 Ark. 40, 204 S. W. 2d 893. The Act also provides that before money can be spent for authorized purposes, the particular project ". . . shall be approved by the United States Fish and Wildlife Service and/or United States Forestry Service and/or the United States Soil Conservation Service, or similar Federal agency having Federal jurisdiction of Federal Aid Programs in Arkansas."

We do not determine (a) whether Act 207 was invalid for want of specific words of appropriation, or (b) whether the requirement for Federal agency approval was likewise indefinite. Approval was given by a Federal authority that did not have matching money.

Had the Act been open to the flaws now complained of, issuance of a voucher within the fiscal period might have been halted by one proceeding appropriately for that purpose. Either the Commission's disbursing agent, the Auditor of State, or the State Treasurer could have been enjoined. But appellants say they were not notified that the Commission intended to issue the voucher, hence they did not have an opportunity to protest. Answer is that notice was not required. When the money was paid into Court, termination of the fiscal year, and expiration of the period for which the appropriation was made, lost significance. The voucher was drawn and the warrant issued within two years from effective date of the appropriation, and in this respect the Constitutional limitation as to time was complied with. It must be remembered that 129 other defendants are, or may be, concerned with the attempt of these three appellants to require a refund of the $40,000 item. As to them, attack on the appropriation bill is collateral to the principal

controversy, and it has no relation to the Commission's power to seek condemnation.

Chief Justice HART, speaking for an undivided Court in *Crawford County* v. *Simmons,* 175 Ark. 1051, 1 S. W. 2d 561, said that a County Court order changing a public road on petition of the State Highway Commission was not void for want of notice to landowners. He cited Act 5 of the Special Session of 1923. The decision sustained an order "laying out" the road, and allowing a year within which claims could be filed and damages assessed. The order was not faulty on Constitutional grounds relating to property taken for public use, and the requirement for compensation. *Barton* v. *Edwards,* 120 Ark. 239, 179 S. W. 354. In the Barton case it was expressly held that payment for the taking of private property for construction of a public road need not precede the taking. There is no presumption that the State or its subdivisions are insolvent. In that case depreciated scrip was held to be good as payment. This rule was modified in effect when a provision of Act 65 of 1929 was held unconstitutional. The Act authorized the Highway Commission to condemn lands "without the necessity of making a deposit of money before entering into possession of the property condemned." *Arkansas State Highway Commission* v. *Partain,* 192 Ark. 127, 90 S. W. 2d 968. In the case just cited it was said: "There is authority in the law whereby the Court, in which condemnation is prayed, may require a deposit in Court of a sum of money sufficient to pay any and all damages which may reasonably be assessed; and the deposit must be in the registry of the Court where the damages will be assessed. . . . This deposit is in effect the payment, and in advance, which the Constitution requires as a condition precedent upon which the property must be taken. Such an order of the Court and a deposit pursuant thereto [place] the fund in the hands of and subject to the control of the Court. The showing that there is or was money in the State Treasury in a sum sufficient to pay the damages does not suffice. . . . In so far as [Act 65] permits the State Highway Commission to enter into the possession of private property, without first compen-

sating the owner for the damages sustained by actual payment of the amount of such damages, or by deposit of. money covering them, in the Court where the right is sought to be exercised, [the Act] is violative of § 22 of Art. 2 of the Constitution."

It was said in *Arkansas State Highway Commission* v. *Hammock,* 201 Ark. 927, 148 S. W. 2d 324, that the action to condemn was a proceeding in *rem,* but that entry upon the property—the actual act of taking— would be restrained at the instance of the owner until payment had been made.

Rules pertaining to condemnation were reviewed in *Selle* v. *City of Fayetteville,* 207 Ark. 966, 184 S. W. 2d 58. The City, without paying the award or making a court deposit, gave notice of abandoning the rights it had acquired through condemnation. That right was sustained. The opinion cites *South Carolina State Highway Department* v. *Bobotes,* 180 S. C. 183, 185 S. E. 165, 121 A. L. R. 1, where the Court said that in the absence of statutory provision to the contrary, the Highway Department could abandon a condemnation proceeding "with consequent nonliability for the amount awarded, even after judgment has been entered on a jury's assessment of the value of the property and an appeal therefrom has been noted." [3]

In the case at bar it is shown that citizens of Conway and Little Rock made substantial contributions to a fund for use of the promotion committee, and that the committee, coöperating with the Game and Fish Commission, would furnish money for the undertaking. It is not urged that this intangible fund has any standing as a cash tender; nor has it.

*Second—Claim of Priority by Pipe Line Company.—* There was testimony on behalf of Magnolia that its line would be covered to a depth of from two to three feet "over most of it," and in places the maximum would reach six or seven feet. The Company's engineers felt that if the waters should be impounded the entire line

---

[3] The legislative authority under which Fayetteville sought to condemn was Act 135 of 1929, where the procedure is that applicable to railroads.

ought to be relocated. This would cost $150,000 or $200,000. But, said the witnesses, there were methods by which the pipe could be wrapped, or encased, affording sufficient protection to prolong usability indefinitely.

When in capacity operation the line carries 100,000 barrels per 24-hour day, for which an average charge of 30c is made. Loss incident to shutting down for a day would be $30,000. In addition, a heavy break would pollute the water and probably destroy the fish.

We do not reach these objections. They are elements of damage for the trial Court's consideration when an order of condemnation is made. The present appeal is from the Court's refusal to enjoin the Commission from constructing the dam and procuring a condemnation order. The testimony is considered in determining whether the Chancellor erred in holding that the project would not be so costly or impracticable as to impute to the Commission capricious conduct.[4]

The Chancellor was not, under the evidence, required to find that Magnolia's use of its property would be so adversely affected by the lake as to deprive the Company of essential easement rights. Under Amendment 35 the Commission, acting for the State, has a paramount duty to the public. If Magnolia's commerce can be reasonably maintained under the limited overflow suggested; or if there can be relocation at a cost not incompatible with the Commission's objectives, the inconvenience and cost to Magnolia—for which there must be compensation —would not justify injunctive interference. Affirmed.

Mr. Justice Robins did not participate in the consideration or determination of this case.

---

[4] An example of witness uncertainty is shown by the testimony of J. E. McGeath, who as assistant general superintendent for Magnolia expressed opinions as to the Company's probable damage. After saying that life of the pipe would be affected by precipitation, water sediment, mineral content of the lake, condition of adjacent soils, etc., he was asked what effect water would have on the line if it should be appropriately encased. The reply was that there would be longer life, but it would be shorter than non-submerged pipe. Question: "How much shorter?" A. "That is a difficult question to answer. For 100 feet it might be one thing, and for a mile something else. It depends on the character of your soil and whatever corrosive elements you have." There was like uncertainty by line experts. Witnesses testified that it was practical to cross rivers and lakes with pipe lines, and that it was frequently done.