HAMPTON *v.* ARKANSAS STATE GAME & FISH COMMISSION.

4-9409                                        238 S. W. 2d 950

Opinion delivered April 16, 1951.

Rehearing denied May 21, 1951.

*Gene Baim, George E. Pike, A. F. Triplett, Hendrix Rowell, Lawrence Blackwell* and *Coleman, Gantt & Ramsay,* for appellant.

*Ed E. Ashbaugh,* for appellee.

*Joseph Morrison,* amicus curiae.

ED. F. MᶜFADDIN, Justice. This appeal presents the question, whether the Arkansas State Game and Fish Commission is authorized to exercise the power of eminent domain to acquire lands on which to establish a public duck hunting project.

Appellee, Arkansas State Game and Fish Commission (hereinafter called "Commission") filed complaint in the Circuit Court naming a number of parties as defendants, and seeking to acquire by eminent domain all of the defendants' rights in 1320 acres of described real estate in Jefferson County, to be a part of a contemplated plot of approximately 40,000 acres, lying in Jefferson and Arkansas Counties, and designated as the Bayou Meto "Wildlife Management Area" or "Bayou Meto Land Acquisition Area". The complaint alleged, *inter alia*: that the Commission was created by Amendment No. 35 to the Arkansas Constitution; that the Commission was empowered to exercise the right of eminent domain to fulfill its duties; that the Commission had the "obligation, duty, authority and responsibility of acquiring, developing and maintaining hunting and fishing facilities for the use and benefit of sportsmen"; and that in discharging such duties the Commission had determined that the lands of the defendants should be taken by eminent domain and made a part of the Bayou Meto "Wildlife Management Area".

The defendants (sometimes herein referred to as landowners) filed separate answers, one of which stated:

"That he denies that" the Commission "is authorized by the Constitution of the State of Arkansas or by any statute to condemn the lands . . . for the purposes set out in the complaint, or any such purpose, and he

denies particularly that" the Commission "is authorized to acquire the lands . . . through condemnation proceedings.

"That he denies that under the provisions of Amendment No. 35 to the Constitution of the State of Arkansas the said Commission is charged with the obligation, duty, authority or responsibility of acquiring, developing or maintaining hunting or fishing facilities for the use or benefit of sportsmen in the State of Arkansas, and he denies that the said Commission is vested with any authority to acquire lands by condemnation . . . for such purpose or to administer, manage, develop or maintain such areas."

The defendants, in thus challenging the Commission's claimed right of eminent domain, asked that the proceedings be transferred to equity which was done.[1] In that forum all other issues were reserved by the terms of a stipulation, reading:

"As of the beginning of the trial, it is stipulated that the question to be presented to the Court at this time, is the question of the right of the plaintiffs to condemn the lands involved in this action for the purposes shown by the pleadings and proof for such condemnation."

The Chancery Court, in its decree, stated the issue:

"With the consent of the Court it was stipulated and agreed that the sole question to be passed upon by the Court at this time is whether the Arkansas State Game and Fish Commission has the authority to condemn the lands in question for the purpose set out in the complaint herein and shown by the testimony presented . . ."

The Chancery Court—relying largely on our opinion in *Wrape Stave Co.* v. *Arkansas State Game and Fish Commission*, 215 Ark. 229, 219 S. W. 2d 948—entered a decree to the effect that the Commission could exercise the power of eminent domain in this case; and the dissatisfied landowner defendants have appealed.

---

[1] Such procedure was approved in *Wrape Stave Co.* v. *Arkansas State Game and Fish Commission*, 215 Ark. 229, 219 S. W. 2d 948.

Some fundamental matters may be stated at the outset:

(A)—A landowner may challenge, by Chancery proceeding, the attempted exercise of eminent domain: see *Burton* v. *Ward, ante,* p. 253, 236 S. W. 2d 65, and cases there cited.[2]

(B)—The right of eminent domain is to be strictly construed against the condemnor and in favor of the landowner. As stated in 18 Am. Jur. 976:

". . . The legislation defining and granting such power must be strictly construed in favor of the property owner, and those asserting the power must be confined within the limits of the legislative grant . . ."

See Lewis on Eminent Domain, 3rd Ed., § 388; Cooley on Constitutional Limitations, 8th Ed., vol. 2, p. 1122; Nichols on Eminent Domain, 3rd Ed., § 3.213; *Peavy-Wilson Lumber Co.* v. *Brevard County,* 159 Fla. 311, 31 So. 2d 483, 172 A.L.R. 168; and *Pontiac Implement Co.* v. *Board of Com'rs, Cleveland Dist.,* 104 O. St. 447, 135 N. E. 635, 23 A.L.R. 866.

(C)—At the General Election in 1944, the People of this State adopted Amendment No. 35 to the Constitution, sometimes referred to as the "Game and Fish" Amendment. Portions of the Amendment germane to the present litigation read:

"Section 1. The control, management, restoration, conservation and regulation of birds, fish, game and wildlife resources of the State, including hatcheries, sanctuaries, refuges, reservations and all property now owned, or used for said purposes and the acquisition and establishment of same, the administration of the laws now and/or hereafter pertaining thereto, shall be vested in a Commission to be known as the Arkansas State Game and Fish Commission . . .

"Section 8. . . . Said Commission shall have the power to acquire by purchase, gifts, eminent domain, or

---

[2] In the case at bar, it is not necessary for us to discuss the claimed right of taking "title to the land in fee simple," rather than a mere easement. That question is reserved.

otherwise, all property necessary, useful or convenient for the use of the Commission in the exercise of any of its duties, and in the event the right of eminent domain is exercised, it shall be exercised in the same manner as now or hereafter provided for the exercise of eminent domain by the State Highway Commission . . ."

It will be observed that § 8 gives the Commission the power of eminent domain "in the exercise of any of its duties"; so we have to examine § 1 to ascertain the duties of the Commission. This section, as previously copied, gives to the Commission "control, management, restoration, conservation, and regulation of birds, fish, game and wildlife resources of the State, including hatcheries, sanctuaries, refuges, reservations."

With the foregoing thoroughly understood, we turn to the facts in the case at bar. The Commission's Executive Secretary, T. A. McAmis, was a candid witness. He admitted that the Commission had been working for several years on the project here involved. It was originally called "Bayou Meto Public Duck Shooting Area", but the name was changed later to Bayou Meto "Wildlife Management Area" or "Bayou Meto Land Acquisition Area". He stated that public shooting would be on 75 per cent of the 40,000 acres hoped to be included in the project. This appears in his testimony:

"THE COURT: What is the primary purpose of this plan in its inception and carrying out—the Number 1 purpose?

"A. The Number 1 purpose is duck hunting and shooting."

And again this appears:

"Q. With reference to the duck situation, couldn't your purposes be accomplished to give ducks the refuge and protection they need without ownership?

"A. Yes; the Federal Government has aided materially; they have two refuges in the State."

Mr. McAmis, on cross examination, identified and allowed to be introduced in evidence the report of T. H.

Holder to the Commission. Mr. Holder has the title "Co-ordinator of Federal Aid"; and his report, relied on by the Commission as influencing its actions, tells of the Commission's real intentions in this proceeding. The report is of 23 pages, but we copy typical sentences:

"The greatest accomplishment which this Commission can make is in the acquisition of suitable areas for public hunting. . . . The Commission is well under way toward completing the acquisition of the Bayou Meto area. We are now ready for the final push which will make one public hunting ground an accomplished fact rather than just something that we say we are going to do . . . Prior to and during the 1920's and early 1930's, duck hunting was commercialized to a considerable extent by professional guides. . . . The decline in the national duck population made hunters realize that ducks could no longer be killed at just any place; . . . There are less than 3,000 duck hunters, who really have a place to hunt, and about 40,000 would-be duck hunters in Arkansas . . . It is uncertain just how much longer most duck hunters will buy hunting licenses and duck stamps, with only a faint hope of getting to go on a good duck hunt. . . . The only possibility of doing something constructive, however, is through the purchase of public hunting areas. We are about 15 years late in getting started, but not too late to take advantage of several outstanding areas that are still available . . . In 1943, the Commission established a public shooting ground in the 22,000-acre Fisher Body tract on the east side of White River, in Monroe County . . . The Monroe County area provided excellent duck shooting whenever it happened to be inundated by flood waters during the open season. . . . In the spring of 1946, an investigation was made of the possibility of establishing a public shooting ground in the Bayou Meto Area of Arkansas and Jefferson Counties. . . . The area is physically well adapted for use as a duck hunting area and has an excellent reputation in this respect. . . ."

From the foregoing, it is crystal clear that Mr. McAmis was absolutely accurate when he said that the "Number 1 purpose" of the project was to provide a duck hunting ground for the public. While it was testi-

fied that squirrel, turkey, deer and other wildlife would be brought to the area for propagation, still it was admitted these could be protected by a closed season, independent of the exercise of eminent domain to acquire a preserve. It was also tacitly admitted that a closed season on migratory fowl, if made by the Federal Government, would serve to protect and preserve the duck population. So, in the final analysis, the evidence shows that this is primarily a duck hunting project, and not a project to preserve wildlife. The plan is to entice ducks to fly to Bayou Meto—rather than down the Mississippi River—thus enabling the hunters to shoot the ducks on their flight from Canada to the warm climate of the Gulf Coast area.

In the light of the evidence and the rules concerning eminent domain, as previously stated, we have no hesitancy in holding that Amendment No. 35 does not give the Commission power of eminent domain to establish a public hunting ground. The words of the Amendment are:

". . . control, management, restoration, conservation and regulation of . . . wildlife. . . ."

The plan here is to kill ducks; and killing is certainly the antithesis of restoration and conservation. Neither can killing be said to be control, management or regulation. When read in the light of the letter and spirit of the Amendment No. 35, it is reasonably clear that ducks will not be conserved or restored by the establishment of a public hunting area. The Commission, in its control of wildlife, may include "hatcheries, sanctuaries, refuges, reservations". A public shooting ground could hardly be likened to any of these.

The Commission claims that the case of *Wrape Stave Co.* v. *Arkansas State Game and Fish Commission*, 215 Ark. 229, 219 S. W. 2d 948, is authority for what the Commission is here undertaking, because we there said:

". . . The Game and Fish Commission is given a very broad discretion in determining how wildlife shall be conserved. . . ."

So we examine that case. In it the Commission proposed to create the Palarm Lake of about 6,000 acres as a fishing preserve. It was recognized that the project would also create a recreational area where fishing would be permitted at certain seasons of the year. The opinion recites that T. A. McAmis testified that the project was

". . . for the conservation of birds, fish, game and (other) wildlife, and to create a recreational area for use of the citizens of the State at large."

But it is apparent that in the Palarm Lake case, the first and primary purpose of the lake was for the propagation of fish. Such primary purpose—propagation or conservation of ducks—is not present in this case. In fact, the record reflects that the prime purpose is the shooting of ducks. There is no similarity between building a lake where fish may live and propagate, and creating a public shooting ground, for the purpose of attracting migratory fowl, in order to provide sport for those who kill them.

We said in the Wrape case that in discharging its duty to control, conserve and regulate the State's wildlife resources, the Commission had a broad discretion in determining *how* these resources shall be conserved. The proof in the case at bar does not show that conservation or propagation is promoted by intermittent shooting, or what might be termed a "thinning-out process". Of course *all* of the area may be lawfully acquired as a *sanctuary* or *refuge,* and for *breeding* purposes. We feel, however, that the plan to utilize three-fourths of the land as shooting grounds goes beyond the intentions of Amendment No. 35. Since it is conceded that only one-fourth of the area of approximately 40,000 acres will ever be used as a refuge where wildlife will be conserved through propagation and non-molestation, it is impossible to see how the right to condemn the excess acreage can be inferred from Amendment No. 35[3]. In *Selle* v. *Fay-*

---

[3] In the oral argument in this Court, it was stated on behalf of the Commission that the power of eminent domain was claimed solely under the Constitutional Amendment, and not under any Statute. We held in *Arkansas Game and Fish Commission* v. *Edgmon, ante,* p. 207, 235 S. W. 2d 554, that the Legislature could not amend or repeal Constitutional Amendment No. 35.

*etteville,* 207 Ark. 966, 184 S. W. 2d 58, we recognized that a municipality could not condemn land for an announced purpose and then forthwith sell the land to private individuals for another purpose.

So here the State cannot, under the guise of a game refuge, take the property of private citizens and then convert the property to a public hunting ground to satisfy the sporting instincts of other citizens.[4] A careful study of the entire Amendment No. 35 shows that it is not the duty of the Commission to acquire lands by eminent domain in order to establish shooting grounds where the public may kill migratory fowl. That is the basic question in this case; and we hold that the Commission does not have such power.[5]

Therefore, the decree of the Chancery Court is reversed and the cause is remanded to allow further proceedings not inconsistent with this opinion.

GEORGE ROSE SMITH, J., dissenting. By implication the majority recognize that the project in question is for a public purpose, and with that view I agree. It is no longer uncommon for states and municipalities to own recreational facilities, such as swimming pools, golf courses, and athletic stadiums. There would undoubtedly be a widespread use of these duck-shooting areas by the general public. To illustrate, last year the State issued 233,796 hunting licenses and 255,602 fishing licenses, the total revenue being $932,660.05. These figures show how numerous are our citizens who participate in hunting and fishing.

But, say the majority, Amendment 35 does not vest in the Commission the power to condemn land for a combined game refuge and hunting area. In the *Wrape* case, cited by the majority, we sustained the Commission's power to condemn land for the creation of a lake where fish would be grown for the recreation of anglers. I cannot escape the feeling that by today's decision the

[4] See Cooley on Constitutional Limitations, 8th Ed., vol. 2, p. 1124, *et seq.;* see also Annotation entitled "Condemnation of land by public authority, to provide hunting and fishing" in 172 A. L .R. 174.

[5] There is not presented in this appeal any question concerning the power of the Commission to acquire lands by purchase.

majority has discriminated against hunters as compared to fishermen.

It is hard to see how the people, in their effort to vest in the Commission complete control over the taking of fish and game, could have used broader language than that contained in Amendment 35. The amendment gives the Commission the general power to control, manage, and regulate our wildlife resources, as well as specific authority to declare bag limits, to fix open and closed seasons, to establish protected areas, etc. I am not convinced that these broad powers stop short of authorizing the proposal now condemned by the majority.

To begin with, one-fourth of the 40,000-acre area will be used as a game refuge, where hunting will be prohibited. For all that this records shows, the shooting area will be subordinate, or at least complementary, to the game refuge. The latter will unquestionably increase the wildlife population, by providing a sanctuary for the birds on their flight southward. The Commission could easily regulate the open seasons and bag limits in the public shooting area in such a manner that the end result of the entire project would be an increase in the State's wildlife. Thus the facts do not support the majority's view that this proposal is the antithesis of conservation.

Next, the amendment provides: "Said Commission shall have the power to acquire by purchase, gifts, eminent domain, or otherwise, all property necessary, useful or convenient for the use of the Commission in the exercise of any of its duties." The power to condemn is patently as broad as the power to purchase; it could not logically be less unless the public will is to be thwarted by a landowner who refuses to sell. Granted that this purpose is a public one, I do not suppose anyone would seriously argue that the Commission lacks the power to purchase property to be used as a game refuge and shooting area. There is not a syllable in the amendment to indicate that a different rule is to prevail in condemnation proceedings.

Finally, I think the majority have confused the meaning of "conserve" with that of "preserve." The latter means to protect entirely from danger, but conservation "stresses the idea of maintenance of an existing condition." Webster's New International Dictionary, Second Edition. On the point of conservation the majority distinguish the *Wrape* case by saying that there the primary purpose was the propagation of fish. True, but propagation for what purpose? So that the fish could be caught by fishermen, of course. That is conservation as the term is used in Amendment 35—a program whereby the wildlife population may be maintained at a level that will permit extensive hunting and fishing. That is the purpose of the project at bar, and I do not think the Constitution requires us to strike it down.

HOLT and MILLWEE, JJ., join in this dissent.