STATE GAME & FISH COMMISSION *v.* HORNADAY.

4-9487                                    242 S. W. 2d 342

Opinion delivered June 25, 1951.

Rehearing denied October 8, 1951.

*L. B. Smead* and *Ed E. Ashbaugh,* for appellant.

*J. Bruce Streett, Thomas E. Sparks* and *Catlett & Henderson,* for appellees and cross-appellants.

GRIFFIN SMITH, Chief Justice. The Game and Fish Commission brought an action in Calhoun Circuit Court to condemn certain lands for use in conservation and propagation of fish. K. G. Hornaday and his wife, Catherine, as owners of some of the land needed for the project, defended on the ground that the primary purpose was not conservation or any of the kindred matters enumerated in Amendment No. 35 to the Constitution. They contended interested persons had purchased a large part of the adjacent lands and planned to organize a private corporation for the purpose of enjoying benefits of the enterprise, to be known as the Tri-County Lake.

It was further alleged that Caney Creek—across which it was planned to construct a dam—was too small in its natural state for adequate fishing, and the proposal to impound its waters was impractical from an engineering standpoint; but, in any event, the motivating influence was a selfish desire by a small group to improve the market for land that had been privately purchased with the expectation that the State would invest an appreciable sum in building the lake. More than $10,000, it was alleged, had been raised through private subscriptions to be spent for promotional purposes. Upon the defendants' motion the cause was transferred to Chancery.

The Commission's engineering plans call for a lake of approximately 500 acres, reaching to a point three miles from the City of Fordyce. It is conceded that local citizens initiated the undertaking and promised to procure the necessary land. The Hornadays first agreed to sell, but later concluded that 100 acres of the land asked

for by the Commission should not be severed from their other holdings, and they therefore declined to part with the needed area.

The Chancellor found that only 81.04 acres were required for actual operations, but seemingly thought that the remaining 18.96 acres would be exposed to such an extent that damage might result from excessive rains or "flash floods." There was preponderating testimony to the effect that security of the land condemned depended upon the additional acreage. The comprehensive plan thought necessary by the Commission could not be "usefully" consummated without the entire 100 acres. The Hornadays owned 1,100 acres in the lake vicinity, all connected except two forties. The land is used for grazing and maintains approximately 140 head of cattle. These cross-appellants had previously sold 300 acres "to certain individuals who are now promoting the proposed lake." Other than the lands owned by cross-appellants, the purchase price was $10 per acre. The Hornadays at one time verbally agreed to sell for $20 per acre, then concluded they would not dispose of any more of their lands. One witness thought an offer at $15 per acre had been made. Other holdings described by witnesses as equal in quality were thought to be comparatively worthless—a figure as low as $2 per acre having been named. The Hornadays, however, believed that $75 to $100 per acre would be about right. The Chancellor assessed damages at $30.

In addition to the defense (a) that the evidence establishes a private purpose to have the State build the lake for local convenience, it is argued (b) that Act 370 of 1949 appropriating funds for the Commission's use is unconstitutional as administered, and (c) the facts here are clearly distinguishable from those in cases where we have affirmed the Commission's right to condemn under Amendment No. 35.

The Commission maintains that fundamentals featuring the instant controversy were settled in the appeal by *Wrape Stave Co.* v. *Arkansas State Game and Fish Commission,* 215 Ark. 229, 219 S. W. 2d 948. Cross-

appellants think the controlling principle is stated in *Hampton* v. *Arkansas State Game and Fish Commission,* 218 Ark. 757, 238 S. W. 2d 950.

In the Wrape case, as here, it was argued that because local interests had contributed money and had importuned the Commission, the undertaking necessarily became *quasi*-private, and in the circumstances public funds should not be used, thereby defeating the right of condemnation.

We agree that the purposes mentioned in Amendment 35 must be present. See §§ 1 and 8 of the Amendment. In commenting upon broad powers conferred upon the Commission, it was said that the right to condemn extends not alone to property actually utilized, but also to lands "useful or convenient." The Commission determines what property is needed, and if its actions do not constitute an abuse of discretion courts will not interfere. We also held that the Amendment was complete within itself, "and that prior legislative Acts, whether directive or restrictive in nature," had been superseded. See *Arkansas Game and Fish Commission* v. *Edgmon,* 218 Ark. 207, 235 S. W. 2d 554.

Essence of the *Hampton* case is that Amendment 35 does not invest the Commission with authority to acquire land by condemnation "to establish shooting grounds where the public may kill migratory fowl." There it was admitted that of 40,000 acres the Commission proposed to acquire, 75% would be utilized for public shooting grounds as distinguished from conservation or propagation within the meaning of the Amendment. But we said that if the entire area should be subjected to use as a sanctuary or refuge, the taking would be lawful.

In the case at bar the lake will be stocked with fish. Sportsmen will be permitted, without discrimination and without restrictions other than those generally prescribed by law or by rules having legal effect, to use it. Cross-appellants think that a reasonable construction of the Amendment would limit the Commission's right of condemnation to areas intended for breeding purposes, and that private lakes and streams should be stocked from

such sources. This concept was rejected in the Wrape case, where it was also held that contributions by local interests and personal assistance extended by individuals and committees did not change the characteristics of an enterprise adopted by the Commission from a public to a private undertaking. We do not see in the evidence a distinction from the Wrape appeal sufficient to justify a finding that the Chancellor erred in holding that there was no collusion, subterfuge, or unwarranted manipulation.

The second contention is that $69,650 paid into the court registry June 29, 1950—one day before expiration of the fiscal year—was an attempt by the Commission to remove funds from the State Treasury in respect of which the 1949 appropriation would have expired. The Act carries an appropriation of $300,000 for use in acquiring lands, and for advertising. Section 3 reads: "Any and all projects or developments under this appropriation shall be approved by the U. S. Fish and Wildlife Service, and/or the U. S. Forestry Service, and/or the U. S. Soil Conservation Service, or similar Federal agencies having jurisdiction of Federal Aid programs in Arkansas." Secretary McAmis, on behalf of the Commission, conceded that the project was not in conjunction with the Federal Government. It was his belief that approval by the agencies mentioned in § 3 of Act 370 was necessary only in those cases where coöperative undertakings were contemplated. To this we agree.

Act 370 is distinct from the Commission's administrative appropriation and contains but three items, two of which are not questioned. Although Amendment 35 gives the Commission all funds arising from the sources upon which it relies, it is necessary that appropriations be made by the General Assembly. But, say the cross-appellants, Art. 5, § 29, of the Constitution, has not been complied with, hence the appropriation is void. It provides that no money shall be drawn from the treasury except in pursuance of specific appropriation made by law, the purpose of which shall be distinctly stated in the bill; and the maximum amount which may be drawn shall

be specified in dollars and cents; and no appropriation shall be for a longer period than two years.

An appropriation that failed to fix the maximum amount a state agency might spend was discussed in *Dickinson, Auditor, v. Clibourn*, 125 Ark. 101, 187 S. W. 909. The Game and Fish Commission (opinion written in 1916) undertook to act under an appropriation setting aside in the treasury "all moneys arising from fines, forfeitures, or licenses under any law for the protection of game and fish." The ground on which the appropriation was held invalid was that it did not fix a maximum beyond which the Commission could not make expenditures.

The Constitutional provision was discussed in *Hudson v. Higgins*, 175 Ark. 585, 299 S. W. 1000. Act 146 of 1927 authorized the board having control of the Agricultural, Mechanical and Normal School for Negroes, at Pine Bluff, to relocate and build a school plant on lands owned by the State. It was further authorized to acquire "such new property and to make such additions to the administrative and teaching staff and equipment as in [the Board's] judgment may be deemed necessary to carry out the purpose for which said institution was created." The State Debt Board was authorized to sell $275,000 in notes to pay for erecting and equipping buildings, "and for other permanent improvements at said school." Section 11 of the Act appropriated $25,000 from the Agricultural, Mechanical and Normal School Fund, "or so much thereof as may be necessary" to defray expenses incident to the sale of notes and for the payment of such interest as may fall due in the biennial period ending June 30, 1929.

Answering the contention that proceeds of the note sale had not been appropriated in conformity with Art. 5, § 29, of the Constitution, the Court said: "Since the maximum amount of money that can be realized from the sale of bonds, under the provision of the statute, is definitely fixed by the whole amount of the bonds authorized issued, $275,000, . . . the Act makes an appropriation of money raised by the sale of the bonds within the meaning of the constitutional provision." Three justices,

including the writer of the opinion (Mr. Justice KIRBY) did not agree with the result.

An appropriation not mentioning a particular project, but available for general purposes contemplated by the Act, was upheld in *Grable* v. *Blackwood,* 180 Ark. 311, 22 S. W. 2d 41. The opinion (1929) was written by Chief Justice HART, who discussed Acts 18 and 153 of 1929. The purpose was to pay valid outstanding debts that were obligations against road improvement districts. No district was designated, nor was the amount due or to be paid in satisfaction of any single item set out in either Act. Commenting on the legislation the Chief Justice said: ''[Act 153] sets apart or assigns to a particular use of a kindred kind a sum of money out of a specific appropriation made by the first Act, the maximum of which is stated in the bill. That is to say, it is for the payment of certain indebtedness of various road districts which had not been included in Act 18. The appropriation is specific as to the purpose for which it is to be used. It is specific as to the time of payment, and as to the fund out of which it is to be paid. That was sufficient to constitute a valid appropriation.''

In *Arkansas Game & Fish Commission* v. *Page, Treasurer,* 192 Ark. 732, 94 S. W. 2d 107, Act 194 of 1935 was construed. By § 2 it was directed that $5,000 be transferred from the Game Protection Fund. The questioned provision was a part of the Act appropriating funds for the State Park Commission. In reversing a lower court decree permitting the transfer Mr. Justice BAKER said: ''However apparently simple, direct and understandable [Art. 5, § 29 of the Constitution] may appear to the reader, it is certain that § 2 of Act 194 . . . complies with [the constitutional mandate] only in one particular, and that is, it fixes definite or certain amounts which may be transferred from the account of the Arkansas Game and Fish Commission, $5,000 for the year 1936; $4,000 for the year 1937. It does not distinctly state the purpose of the transfer of this money.''

Headnote No. 5 to *Scougal* v. *Page,* 194 Ark. 280, 106 S. W. 2d 1023, summarizes the opinion of Special Justice

WOOTEN as follows: "Where the purpose expressed in § 3 of Act 278 of 1937, making the appropriation, was the payment of expenses to be incurred in refunding operations, and the appropriation was specific in that it transferred the money from the Bond Refunding Fund, and such additional funds as might be necessary for the appropriation made in § 1 of the Act, it was a sufficient compliance with Art. 5, § 29, of the Constitution." There were three recorded dissents.

The definition of an appropriation was reëxpressed by Chief Justice McCULLOCH as "a setting apart from the public revenue of certain sums of money for a specific object in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and for no other." *Jobe* v. *Caldwell*, 99 Ark. 20, 136 S. W. 966.

In the Act questioned here the maximum amount, $300,000, is fixed and the primary purposes are definitely related, forming a general plan for the acquirement of lands, conservation, etc. A more tenuous question is that part of the appropriation authorizing funds to be spent "in advertising Arkansas' advantages," but there is no showing that any of the money was spent for advertising purposes—an enterprise as to which no maximum sum was mentioned. Since the overall purpose was conservation, as expressed by the language of Item 1 of the Act, the legislative purpose as a whole did not fail because there was included in the measure an indeterminate authorization not shown to have been resorted to.

Final objection is that because the money was vouchered June 29th from the appropriation for a fiscal period expiring the following day, there is no lawful fund for payment of condemnation damages. The record shows that three vouchers were issued. Each was converted into a warrant, and the warrants paid by the Treasurer of State, hence the money held in the Court's registry is the proceeds of these warrants.

Act 311 of 1945, regulating the time in which warrants and vouchers may be issued, no doubt supersedes Act 781 of 1923, § 8. Act 311, Ark. Stat's, § 13-554,

authorizes disbursing agents to issue vouchers for the payment of obligations incurred, or which become due, prior to the close of any fiscal year on June 30th. Such vouchers must be presented to the State Comptroller's office not later than August 15th following the close of the fiscal year; "and the Auditor of State shall issue his warrant in payment of such voucher not later than August 31 following the close of the fiscal year; . . . provided, that in the event a service is performed or contract entered into by any State agency, which would require that the obligation be incurred or commenced in the closing period of one fiscal year, and such obligation be not completed until after the close of the fiscal year, then the payment of such obligation may be made in whole or in part from either fiscal year."

There can be little doubt that the Commission's obligation, as reflected by resolutions, was incurred during the year the vouchers were issued, although the project could not be completed or physical construction begun until condemnation cleared the title. The deposit does not appear to have been resorted to as an indirect method of defeating any applicable statute.

Action of the trial Court in attempting to retain jurisdiction for the purpose of entertaining damage claims must mean that a preponderance of the evidence indicated that construction of the lake would result in occasional overflows. It follows that this small area of 18.96 acres was essential to the enterprise and it ought to have been included in the decree on the same basis of compensation, $30.

That part of the decree condemning 81.04 acres is affirmed, but that part denying condemnation of the remainder and retaining jurisdiction to permit future damage actions against the Commission is reversed.

Mr. Justice McFADDIN and Mr. Justice WARD dissent.

ED. F. McFADDIN, Justice (Dissenting). This is the third case directly involving the eminent domain power sought to be exercised by the Arkansas State Game and Fish Commission under Amendment No. 35 of the Con-

stitution. The two previous cases are *Wrape Stave Co. v. Arkansas State Game and Fish Commission,* 215 Ark. 229, 219 S. W. 2d 948, and *Hampton* v. *Arkansas State Game and Fish Commission,* 218 Ark. 757, 238 S. W. 2d 950.

*Wrape* v. *Commission, supra,* was an eminent domain proceeding for the purpose of constructing a lake in Faulkner County; and one of the questions was whether the purpose was within the purview of the Constitutional Amendment. We recognized in that case, as we have all along, that the Commission has authority to exercise eminent domain within the purview of the Constitutional Amendment. We said:

"The Game and Fish Commission is given a very broad discretion in determining how wildlife shall be conserved. Not only may it acquire, by condemnation or otherwise, the property actually needed, but it may also procure any that may be *'useful or convenient . . .* in the exercise of any of its duties'; and, while in matters of mere convenience the power would not be unlimited, yet the italicized words serve to emphasize a plan by those who framed the Amendment—a bilateral purpose to conserve wildlife, and to place that duty with the Commission."

*Hampton* v. *Commission, supra,* was an attempt by the Commission to take land by eminent domain for the purpose of constructing a public duck shooting ground; and we said:

"The plan here is to kill ducks; and killing is certainly the antithesis of restoration and conservation. Neither can killing be said to be control, management or regulation. When read in the light of the letter and spirit of the Amendment No. 35, it is reasonably clear that ducks will not be conserved or restored by the establishment of a public hunting area. The Commission, in its control of wildlife, may include 'hatcheries, sanctuaries, refugees, reservations.' A public shooting ground could hardly be likened to any of these."

194

The effect of our holdings involving Amendment No. 35 is that eminent domain may be invoked by the Commission when the purpose is within the purview of the Amendment, *i.e.,* conservation; but eminent domain cannot be invoked by the Commission when the purpose is to create recreational facilities, hunting grounds, fishing lakes, etc.

In the present case the Commission is seeking to exercise eminent domain for the purpose of constructing a lake. The question is whether the primary purpose in the case at bar is to conserve fish or to create a lake for public fishing and recreation. I think the primary purpose of the lake is to create a recreational facility where the public may fish; and I do not believe the primary purpose is to restore and conserve wildlife. I will not review the testimony at length: it would serve no useful purpose. But after studying the entire record I am firmly of the opinion that the primary purpose of this project is to create a recreational facility. Eminent domain should be allowed by the courts only when it is clear that the State is taking the property to fulfill clearly allowed constitutional grants. Such showing has not been made in the case at bar, as I see the record. Therefore, I respectfully dissent from the majority holding.