ARKANSAS STATE GAME AND FISH
COMMISSION *v.* Harley D. GILL et al

75-388                                      538 S.W. 2d 32

Opinion delivered July 6, 1976

*William H. Donham,* for appellant.

*George E. Pike* and *Macon, Moorhead & Green,* by: *J. W. Green Jr.,* for appellees.

FRANK HOLT, Justice. This case involves the eminent domain power of the appellant under Amendment 35 of the Arkansas Constitution (1874). Appellant brought suit in the circuit court to condemn 143.76 acres of appellees' lands pursuant to the authority of that Amendment. The land sought to be condemned is adjacent to approximately 34,000 acres of land (the Bayou Meto Wildlife Management Area) owned and managed by appellant. During the duck hunting season, appellant annually floods a portion (a green tree, artificial reservoir) of the Bayou as a wintering habitat for the migratory mallard duck. The water impoundment is later released in mid-February of each year to prevent damaging the green timber in appellant's artificial reservoir. As a result of this annual seasonal flooding, approximately 20 to 40 acres of appellees' lands are sometimes flooded, damaging their crops. Appellant, in its complaint and declaration of taking, alleged that appellees' lands are necessary, useful and convenient in the exercise of its control and management of the wildlife management area. The appellee landowners filed a motion to strike the declaration of taking on five grounds: (1) the taking is contrary to Amendment 35 to the Arkansas Constitution for the reason that the taking is not in the public interest; (2) the taking is contrary to the finding in *Hampton* v. *Arkansas State Game and Fish Commission*, 218 Ark. 757, 238 S.W. 2d 950 (1951); (3) the taking is not necessary to carry out the statutory and constitutional purposes of the Commission; (4) appellee landowners would be irreparably damaged for which they have no adequate remedy at law; and (5) the purpose of the taking is to avoid building dams, levees, or other structures to prevent flooding of appellees' lands. On appellees' motion the action was transferred to chancery court. After hearing the evidence, the chancellor dismissed the complaint and declaration of taking, finding in part:

> There is really very little difference between the facts of this case and, certainly, the facts that existed and the purposes that were present and involved in the Hampton case. It can be said that the Game and Fish Commission is seeking to condemn the defendants' lands to make it a part of the Bayou Meto Wildlife Management Area to improve the, basically, duck hunting and duck killing capabilities of this area, and that, the Supreme Court says, it cannot do. **** So, Ground No. 1., the

Court holds that ultimately, even though the witnesses for the plaintiff were not trying to deceive the Court, the Court believes they gave their testimony in utmost good faith, but when they have testified that the purpose is to improve the habitat of this area, the Court must pursue that further than they did and, as stated, and to repeat, that is in the opinion of this Court for the purpose of improving that quality of the habitat so that the duck shooting in that area can be and will be enhanced, and that is not permitted under Arkansas Law according to the Hampton case.

Appellant asserts that the evil sought to be corrected is that the Commission cannot fully operate its green tree artificial reservoir without flooding the appellees' private lands lying adjacent to the Bayou Meto Wildlife Management Area. Therefore, the acquisition is for the purpose of acquiring such lands in order to fully utilize the waterfowl habitat previously acquired for the W.M.A. Appellant candidly admits that it is asking this court to either overrule or distinguish *Hampton, supra,* from the case at bar. Appellant further correctly recognizes that this court is reluctant to overrule previous decisions except for clear and demanding cause.

In *Hampton, supra,* the Arkansas Game and Fish Commission, pursuant to Amendment 35, sought to condemn 1,-320 acres of land to become part of the Bayou Meto Wildlife Management Area. The chancery court sustained the Commission's authority to exercise eminent domain there. On appeal we reversed saying:

So here the State cannot, under the guise of a game refuge, take the property of private citizens and then convert the property to a public hunting ground to satisfy the sporting instincts of other citizens. A careful study of the entire Amendment No. 35 shows that it is not the duty of the Commission to acquire lands by eminent domain in order to establish shooting grounds where the public may kill migratory fowl. That is the basic question in this case; and we hold that the Commission does not have such power.

In the case at bar the chancellor found the same situation to exist as in the *Hampton* case; namely, the Commission was attempting to improve the habitat of the Bayou Meto area for the purpose of enticing migratory mallard ducks to this public hunting ground for the purpose of hunting and killing ducks. We think the evidence clearly preponderates in support of the chancellor's finding. In fact, appellant agrees that it "has no quarrel with the finding of the court below that the direct purpose of the taking was to improve the quality of the habitat for ducks, but that the purpose of improving the habitat was to attract more ducks to the Bayou Meto Wildlife Management Area where regulated public hunting is allowed." The thrust of appellant's argument, as indicated, is that we should "either outright reverse the rule established therein or distinguish it from the case at bar." We must decline appellant's persuasive argument to overrule the longstanding precedent established by *Hampton*. Neither can we agree with appellant that *Hampton* is distinguishable from the case here. Nor can we agree that *Hampton* is overruled by our decision in *State Game & Fish Comm.* v. *Hornaday*, 219 Ark. 184, 242 S.W. 2d 342 (1951).

We deem it unnecessary to discuss appellant's additional contention that the chancery court was without jurisdiction to substitute an alternative remedy (building a levee with pumps to prevent flooding) to the eminent domain proceeding initiated by appellant.

Affirmed.

Smith, Fogleman, and Byrd, JJ., dissent.

John A. Fogleman, Justice, dissenting. I respectfully dissent, but I cannot join with those who would overrule *Hampton* v. *Arkansas State Game & Fish Comm'n*, 218 Ark. 757, 238 S.W. 2d 950. On the record before the court in that case it seems to me that the court was right. Amendment 35 does not authorize the exercise of the power of eminent domain to acquire lands on which to establish a public duck hunting project. That was the only question presented and the only one decided. In *Hampton*, the complaint alleged that the Commission had the obligation, duty, authority and responsibility of acquiring, developing and maintaining hunting and fishing

facilities for the use and benefit of sportsmen and that the taking was in the discharge of that duty. Clearly, it does not have that duty but no other purpose for the taking in *Hampton* was alleged or proved. The landowner's challenge was that the Commission did not have the power to condemn the lands for the purposes stated in the complaint and that the Commission did not have the obligation, duty, authority or responsibility of acquiring, developing or maintaining public hunting facilities. It was stipulated at the beginning of the trial that the question to be presented to the court was whether the Commission had the right to condemn the lands "for the purposes shown by the pleadings and proof for such condemnation." The decree in the chancery court recited the stipulation. The executive secretary of the Commission testified that the number one purpose of the plan in its inception and execution was "duck hunting and shooting." The report of the Commission's Coordinator of Federal Aid stated that the Commission's greatest possible accomplishment was in the "acquisition of suitable areas for public hunting, that "we are now ready for the final push which will make one public hunting ground an accomplished fact." "The only possibility . . . is through the purchase of public hunting areas," and "In the spring of 1946, an investigation was made of the possibility of establishing a public shooting ground in the Bayou Meto area . . . The area is physically well adapted for use as a duck hunting area and has an excellent reputation in this respect."

As the court said in *Hampton,* a public shooting ground can hardly be likened to a hatchery, sanctuary, refuge or reservation. It was conceded in *Hampton* that only one-fourth of the area would ever be used as a refuge. The opinion concluded:

> . . . A careful study of the entire Amendment No. 35 shows that it is not the duty of the Commission to acquire lands by eminent domain in order to establish shooting grounds where the public may kill migratory fowl. That is the basic question in this case; and we hold that the Commission does not have such power.

This is a different record indeed. In the declaration of taking, it was alleged that the public use for which the property was taken was to facilitate the control and mangement of a

wildlife management area. On the face of the pleadings the taking was for purposes stated in Amendment 35.

Bill Gaines, Real Estate Officer for the Commission, who has a bachelor's degree in biology with special courses in wildlife management, forestry and surveying, testified about the purposes of the taking, as did Lawrence N. Owens, District Game Biologist for the Commission. Their testimony may be summarized:

There is a green tree reservoir on the Bayou Meto Wildlife Management Area, which is controlled by two levees, the upper Vallier School levee and the lower Vallier School levee. The upper levee has very little watershed and is utilized to keep water off the Gill property, holding that reservoir to 551.53 acres. The normal pool elevation to afford an adequate waterfowl habitat in the winter in the upper area (1,243 acres) is 1,785 feet mean sea level, but when the water reaches this level, it overflows on the Gill property and another tract. The Commission would like to maintain an area of 3,566.67 acres as a green tree reservoir, and would use all the Gill land, other than that upon which the water would spread, as a buffer zone for excess runoff and excess water in the area. The acquisition of this piece of property is necessary, useful or convenient for the use of the Commission in the exercise of its duties for the following reasons:

The acquisition of this piece of property from a management standpoint of managing the green tree reservoir for a wildlife and waterfowl habitat, this property is necessary to act partially as a buffer zone when you have high flows into the area and not capable of letting the water out of the basin quick enough and getting on this private land and also a portion of it to be a permanent pool for waterfowl habitat without hampering of the management of the entire upper green tree reservoir.

Without the acquisition of this property it would be almost futile to even attempt to manage a green tree reservoir in the upper Vallier School area. The terrain is

so flat that raising the water level six inches increases the size of the green tree reservoir from 551 acres to 1,-243 acres, but managing the green tree reservoir here is almost useless because private property is damaged when water is raised to the higher level. The maximum manageable green tree area includes a portion of the Gill property. The primary purpose is not to grow grain on the Gill property but to acquire fee title so the management of the Bayou Meto Wildlife Management Area can be carried out. The purpose of having water in the green tree reservoir is to provide winter habitat for waterfowl, principally ducks. No designated area is set aside in the Wildlife Management Area for hatching and raising ducks. Part of it, the Wrape plantation, consisting of 500 acres, is closed to duck hunting, except for the last three days of the season. The rest of the area is closed to duck hunting for half of each day, so that ducks will remain in the area throughout the winter. Constant harassment would cause them to leave. Some mallards remain in Arkansas throughout the winter.

The waterfowl is dependent upon wintering grounds as much as upon rearing ponds in Canada and the northern part of the United States. Providing for them to remain and feed in the winter is part of conservation. Arkansas, along the Mississippi River and in the Stuttgart area, has been a traditional mallard winter ground during migration. Because the area is a basin which floods, it has been used primarily for waterfowl management. The primary purpose is to attract ducks during the winer months and the provision of hunting along with that is within the realm of good, scientific game management. The overall purpose is management. The side effect is hunting.

Mallards attracted to the area from the Mississippi flyway remain until about the middle of February. The spillways are then opened. Only about five per cent of the Bayou Meto Wildlife Area — the green tree area — is flooded for waterfowl. A primary purpose of the green tree area is duck hunting, which is a tool in conservation to keep the waterfowl population in balance. The Wildlife Management Area surrounds the Gill property

on three sides. The combined area of the upper and lower green tree reservoirs was designed to flood between 7,000 and 9,000 acres. The area was primarily set up for a wintering habitat for waterfowl, not for hunting.

Amendment 35 to the Arkansas Constitution charged the Commission with the duty of control, management, conservation and regulation of birds, game and wildlife resources of the state. §§ 1 and 8, Amendment 35. Traditionally, waterfowl have been a resource of this state. Providing a winter habitat for them is a proper function of the Commission in the control, management, conservation and regulation of the migratory waterfowl which are birds, game and a wildlife resource. The evidence shows that a winter habitat is as essential in the conservation and management of this wildlife resource as nesting grounds. The evidence also shows that hunting is necessary to maintain the proper population balance as a conservation measure. If summer or winter habitats are overpopulated, it stands to reason that this wildlife resource will suffer. There was no evidence in *Hampton* that conservation or propagation was promoted by intermittent shooting, or a thinning out process, as there is here. The primary purpose here is not acquisition of a public duck shooting facility. *Hampton* is easily distinguished.

I would reverse the decree and remand for further proceedings.

CONLEY BYRD, Justice, dissenting. To me the case of *Hampton* v. *Arkansas State Game & Fish Commission,* 218 Ark. 757, 238 S.W. 2d 950 (1951), was overruled by *State Game & Fish Commission* v. *Hornaday,* 219 Ark. 184, 242 S.W. 2d 342 (1951). If the Game and Fish Commission can use the power of eminent domain to make a lake for fishermen to fish, I fail to understand the logic that prevents the Commission from using the same power of eminent domain to provide a lake for duck hunters to hunt. Amendment 35 to the Arkansas Constitution does not make the distinction.

For the reasons stated, I respectfully dissent.

GEORGE ROSE SMITH, J., joins in this dissent.