CITY OF LITTLE ROCK *v.* SAWYER.

5-1400                                309 S. W. 2d 30

Opinion delivered January 20, 1958.

*Spitzberg, Bonner, Mitchell & Hays,* for appellant.

*Talley & Owen* and *James R. Howard,* for appellee.

CARLETON HARRIS, Chief Justice. This action is a suit brought by and in behalf of the City of Little Rock to condemn lands required for the city's new water supply reservoir on the Big Maumelle River, said lands being owned by appellees, Octavia and J. G. Sawyer. The tract involved contains approximately 322 acres, is divided north and south by State Highway No. 10, and lies

at the intersection of State Highways No. 10 and No. 13 at the point commonly known as Crossroads, located about 22 miles west of Little Rock. Big Maumelle River crosses part of the lands, which, according to the evidence, are partly timbered and partly open. The property, which was formerly used as a dairy farm by the owners, contained a dwelling house, fences, and various farm buildings. The jury returned a verdict of $55,000 for appellees, from which judgment the City and the Board of Commissioners of the Little Rock Municipal Water Works have appealed. For reversal, appellants urge four points, as follows:

### I.

The Jury Verdict of $55,000 was Excessive and was not Supported by Substantial Evidence.

### II.

The Lower Court Erred in the Exclusion and Admission of Evidence Relating to Values.

### III.

The Lower Court Erred in Admitting Testimony Concerning an Offer in Compromise and Settlement Made by the City and in Refusing to Grant a Mistrial.

### IV.

The Lower Court Erred in Dismissing the Board of Commissioners of the Little Rock Municipal Water Works as Parties Plaintiff.

We proceed to a discussion of each contention in the order listed.

### I.

Here we are concerned only with whether there was substantial evidence to support the verdict of the jury. Appellees' evidence consisted of the testimony of Mrs. Sawyer, Jim Bland, a neighbor, who testified he had lived within a half-mile of the Sawyer place for 21 years,

Thomas Johnston, a neighbor, who testified he had been familiar with the Sawyer property since 1933, Don Windle, a salesman for the Pulaski Implement Company and former instructor with the Institute on Farm Training, Fred Selz, a real estate salesman for Block Realty Company for nine years, specializing in rural property, A. L. Saunders, engaged in real estate development business and formerly chief appraiser for the Highway Department (1954), W. H. Pitcock, who testified that he had specialized in rural real estate in Pulaski County for 12 years, and O. B. Higginbotham, who estimated that the tract contained 50,000 board feet of merchantable timber.

Appellants point out that a witness, in giving an opinion of value, must also give a satisfactory explanation of how he arrived at his conclusion; that there is a difference between "any evidence" and "substantial evidence"; that when the evidence given by appellees' witnesses is weighed under such a rule, there is no basis for their opinions, and the verdict is accordingly not supported by substantial evidence. Mrs. Sawyer described the house on the property as a large, English-type house, with ten rooms, one bath, a place for another bath, and a 30 x 20 glassed-in porch. Located on the property also were a feeding barn, large stock barn, several sheds, hog houses, chicken houses, implement sheds, four deep wells, a stock pond, and five miles of fencing.

Mrs. Sawyer testified that $7,500 had been spent in altering the house since the purchase in 1948, and she valued the entire property at $85,000. Jim Bland concurred in this opinion. Thomas Johnston, a neighbor, testified that the Sawyer property under fence is flat, level soil . . . bottom land, and that he had occasion (because of his milk route) to be at the Sawyer place every day until September, 1955. He testified that dairy barns are graded as to their construction and maintenance, and Sawyer's was grade A; that Sawyer had a "milking parlor," which, according to his testimony, is the most modern type of milking barn developed[1]. He

---

[1] "His was laid out in a circle of stalls with stanchions and a pipeline milker. He didn't milk in a milk bucket. The milk ran into the

stated this was the only milking parlor on his route. Mr. Windle testified the cleared land was mostly in permanent pasture[2] in 1955, and that Sawyer had sixty or seventy head of cattle; that the fences were very good and were constructed of webbed wire and barbed wire. Mr. Selz testified that he was a former salesman with the Rhineman Horse and Mule Company and ''that kept me in touch with all the farmers and all the farms in this town.'' He testified he had made some other sales of property in the general area, but not in the immediate vicinity, i. e., some five or six miles from it; that he appraises farm property for Block and has handled nine-tenths of the acreage transactions for the past five years; that he helped handle the sale by Mrs. Sawyer to Mr. Almon of acreage adjoining the property in question; that the two tracts were so dissimilar as to preclude a comparison between them. He valued the farm and improvements at $70,670. Mr. Saunders testified he had been engaged in buying rural property since leaving the Highway Department; his appraisal of the property amounted to $84,327.03. Horace Pitcock, who testified that he specializes in selling farms and suburban property, valued the farm at $70,670, and stated that he conferred with Selz on arriving at the appraisal. He explained that in arriving at the same figure ''* * * one gave and one took.'' Mr. Higginbotham was not interrogated on cross examination as to his estimate that the tract contained 50,000 board feet of merchantable timber.

The following witnesses testified for appellants, in brief, as follows: Jeff Graham, who has been engaged in termite control work for 20 years, inspected the Sawyer dwelling property and testified there was a general infestation of termites. He could not state how long the

---

milking machine and directly into his cooler. It was a very nice setup. * * * in a milking parlor your cows are on a raised elevation and you walk between the several stalls there in a circle, and you work your stanchion doors from your level, the floor level down there, it is a time saving device, and it saves walking and carrying feed and milk buckets and in the handling of your milk. It is designed to save time, and for cleanliness, too."

[2] This pasture was planted with fescue, ladino clover and Bermuda grass.

termites had been in the structure . . . infestation had gone above the ground floor, but he could not estimate the damage without the major operation of exposing the walls . . . did not know extent of damage on October 26, 1956[3]. He made no termite inspection of the barns or outbuildings. C. V. Barnes stated that he had been experienced in dwelling construction since 1939; that he had visited the Sawyer property on two occasions, and found it was not in good repair. He stated there were roughly 3,400 square feet in the house . . . casement windows showed evidence of decay and rot . . . there were two places where the foundation was not supporting the house properly . . . the house had not been painted in a number of years . . . "the roof is sound but it is about five years old." Claude Woolsley, presently semi-retired, is a horticulturist and agriculturist, and has taught at the Universities of Arkansas, Tennessee, Virginia, and at Arkansas A & M. He testified that he managed a farm in Illinois for 30 years, and operated an orchard farm in Washington County. Mr. Woolsley took soil samples from the Sawyer farm, and stated the soil could be divided into two types . . . hill soil and deep silt loam. He testified that the hill soil was thin, having a top soil "of about two inches to four inches of blackland loam soil underlaid with a subsoil over a reddish yellow clay." The second type was a "deep silt loam soil underlaid by an impervious subsoil of clay or clay loam." He considered the land as partly good and partly bad, productive, but inclined to be wet, which would mean low productivity in some seasons. He stated the upland was subject to erosion, saw no evidence of corrective measures to prevent such erosion, and was of the opinion that "soil of this type containing a subsoil of high and low permeability, subject to heavy spring rains and the possibility of inundation from other sources, would develop a rather grave hazard as far as row crop production is concerned." He stated that the land would be better for pasture; observed a part being grown in permanent pasture, but "it was a very poor stand of any clover

---

[3] Date property passed to City of Little Rock.

crop.'' Frank Fulk, real estate dealer, valued the property at $30,820. James W. Larrison, engaged in the real estate business for 11 years, valued the farm at $32,040, and Elmer McCaskill, who testified he had been in the real estate business for 40 years, placed the value at $31,800.

The record reflects, that in the main, appellants' witnesses went into more detail explaining how they arrived at their appraisal; still, several left pertinent facts unexplained. For instance, Mr. Larrison did not break down the value of the timber, though he stated it had a high value, which had been considered in reaching the overall valuation placed on the farm. He did not estimate the number of board feet represented by the standing timber on the property. It is difficult to see how the value of the timber was properly considered if it was not appraised. Mr. Larrison testified that he considered the fence in the evaluation, but did not know what it would cost to reproduce it . . . nor did he see all of the fence . . . that it would cost about 15c per lineal foot to build a good four strand barbed wire fence. Mr. McCaskill, in his appraisal, stated the fence was taken into consideration in placing the value on the farm, i. e., it was considered a farm ''with fence around it''; however, he did not know how many miles of fence were located on the premises, nor what it would cost to build same. He stated there were four good wells, but he did not know their depth.

It was developed during the examination and cross examination of witnesses, that in determining the fair market value of property, certain facts should be considered, such as the nearness of the property to a business center, presence or absence of public utilities, voluntary sales of other properties of similar nature in the community, the type of land and soil, nature of improvements, etc. The jury observed each witness in his testimony . . . heard the evidence relative to the qualifications of the various witnesses . . . heard the testimony as to how these witnesses arrived at the

valuations testified to. As was stated in *State Highway Commission* v. *Carder,* 228 Ark. 8, 305 S. W. 2d 330: "* * * Also in cases of this kind, the jurors are accorded great latitude in considering testimony as to damages, and their verdict will be set aside as excessive only when it is not supported by proof or when it is so excessive as to indicate passion, prejudice, or an incorrect appreciation of the law applicable to the case. * * *" The appraisers who testified for appellees would seem to be qualified from the basis of experience and knowledge, nor are their qualifications questioned by appellants. Likewise, the testimony of the neighbors are entitled to consideration. As said in *Ft. Smith and Van Buren Bridge District* v. *Scott,* 103 Ark. 405, 147 S. W. 440: "Intelligent men, who have resided a long time in the place and who are acquainted with the land in question, and say that they know its value, are competent although they are merchants or farmers and have never bought or sold land in the place." We conclude there was substantial evidence to support the verdict.

## II.

A. It is contended that it is not permissible to admit testimony concerning the reproduction costs of the improvements where the condemnor is not acquiring improvements alone, but acquiring land with improvements attached. It is conceded by respective counsel that this question has never been passed upon directly by this Court. The case of *Newport Levy District* v. *Price,* 148 Ark. 122, 229 S. W. 12, is cited by appellants as inferring that such evidence is not admissible in this state. However, a study of this case reveals differences which preclude a proper comparison with the case at Bar.

There is a conflict of authority on whether evidence of reproduction costs is proper in reaching a determination of the market value of property being condemned; the weight of authority holds such evidence to be admissible where the improvements are adaptable to the land[4]. In the New York case of *Re: Blackwell's Island*

---

[4] Appellate courts in the following states, among several others, have held such evidence admissible: New York, Wisconsin, Massachusetts, Louisiana, Idaho, Connecticut, Iowa, Ohio, and Maryland.

*Bridge,* 198 N. Y. 84, 91 N. E. 278, the Court of Appeals said:

"* * *. All proceedings prosecuted under the right of eminent domain are based on two fundamental facts. The first is that the owner's land is taken from him theoretically against his will, and the second is that the owner is not permitted to fix his own price, but must be content with just compensation. The latter is a burden to which the owner must submit, but it is also a right which he may enforce. What is a just compensation? In some cases the value of expensive structures may not enhance the value of the land at all. An extremely valuable piece of land may have upon it cheap structures which are a detriment rather than an improvement. A man may build an expensive mansion upon a barren waste, and in such case, the costly building may add little or nothing to the total value. In the greater number of cases, however, when the character of the structures is well adapted to the kind of land upon which they are erected, the value of the buildings does enhance the value of the land. In such cases, it is true that the value of the land as enhanced by the value of the structures is the total value which must be the measure of the owner's just compensation when his property is condemned for public use. As to that general proposition, there can be no disagreement. But how is the enhancement of the land by the structure which it bears to be proven? * * *. It is common knowledge, however, that buildings not only differ from each other in design, arrangement and structure, but that many which are externally similar and are situate upon adjoining lands are essentially different in the quality and finish of the materials used and in the character of the workmanship employed upon them. It must follow that such differences contribute in varying degrees to the enhancement and the value of the land, and we think of no way in which they can be legally proved except by resort to testimony of structural value, which is but another name for cost of reproduction. * * *"

A similar view was taken by the Iowa Supreme Court in *Ranck* v. *Cedar Rapids,* 134 Iowa 563, 111 N. W. 1027. There the Court said:

"It is true that market value and intrinsic value are not necessarily equivalents, but proof of the latter is often competent evidence for consideration in determining the former. \* \* \*"

Let it be made clear that we entirely agree with appellants that such evidence is not admissible as a measure of damages, but we do conclude that it is admissible as an element or circumstance to be considered along with all other circumstances in arriving at a proper award. We accordingly hold this evidence competent.

B. Appellees' witness, Fred Selz, testified that in arriving at the value of the Sawyer tract, he disregarded the sale from Mrs. Sawyer to Almon of adjoining acreage because there was no comparison between the two farms. He stated that practically all the Almon tract is hilly—"It goes up and down—it is what we call hilly land." He testified that 503.31 acres were involved in the sale, and only about 30 acres were similar to the Almon tract. When interrogated on cross examination about the consideration for the sale, counsel for appellees objected on the ground that it had not been shown the two tracts were comparable, and further, because there had been no showing the Almon land was improved. The court sustained the objection, holding that appellants would have to develop a similarity between the properties before the question would be proper. Appellants contend this was error. We do not agree. Before this evidence would have been admissible, similarity between the two tracts must have been shown. *St. Louis Iron Mountain & Southern Railway Co.* v. *Theodore Maxfield Company,* 94 Ark. 135, 126 S. W. 81. Such evidence was not offered; nor does the record reflect what the answer of the witness to the question would have been. No offer of proof was made. While not likely, —as far as we know, the answer might have been favorable to appellees; if that had been the case, appellants could not have been prejudiced by the court's refusal to

permit the question. Appellants' argument is not well taken.

### III.

Appellees' cross examination of appellants' witness, James Larrison, related to whether Larrison had had the same fixed opinion of the value of the property from the beginning, and included the specific question of whether Larrison had at one time submitted a higher figure to his employer, the Little Rock Municipal Water Works. An affirmative answer was given. The witness was subsequently asked, ''To whom did you turn your appraisal over to?'' Larrison replied, ''Mr. McCaskill was the agreed custodian of the files and we signed a statement for a joint figure which we recommended for negotiations to avoid a law suit.'' Appellants immediately moved for a mistrial, which motion was denied, the court holding the answer to be a voluntary statement from the witness, and admonishing the jury to disregard same. Clearly, the above answer was not responsive to the question; a proper answer would simply have been, ''Mr. McCaskill.'' We are of the opinion that the questions asked on cross examination, seeking to ascertain whether the witness had ever had other than the one opinion of the market value of the property, were entirely proper, and entirely legitimate for the purpose of testing credibility. We do not agree with appellants that this answer was invited by appellees' counsel, and feel it would be manifestly unjust to penalize appellees because of this voluntary response. The court committed no error in continuing with the trial.

### IV.

Finally, it is contended that the court erred in dismissing the Board of Commissioners of the Little Rock Municipal Water Works as party plaintiffs. In the first place, we are unable to see that any prejudice resulted from this action. It cannot be said that the commissioners had a personal interest in the litigation; they were more or less nominal parties by virtue of the of-

fice they held, which fact certainly would have been known to the members of the jury. Be that as it may, we do not consider the contention well taken. The Little Rock Municipal Water Works was organized and operates under Act 131 of 1933, as amended. Act 215 of 1937 empowered city councils to appoint boards of commissioners to operate the water works system. Said Act (Sec. 19-4223, Ark. Stats. Anno. 1947) provides that the commissioners should have complete authority to "* * * manage, operate, extend and maintain the municipal water works and distribution system, and shall have full and complete charge of said plant, * * * provided, said commissioners shall not have authority or power to sell, mortgage, or encumber said waterworks or distribution system. * * *" The power of eminent domain is an attribute of sovereignty, and the procedure for exercising same is a matter for legislative regulation. *Common* v. *Felsenthal,* 180 Ark. 1075, 24 S. W. 2d 856. The authority for the taking of private property for public use should be clearly expressed and the statute strictly construed. As found in Crawford on Statutory Construction (1940) Sec. 340, page 696: "Statutes which relate to the power of eminent domain should be strictly construed in favor of the landowner largely because they are in derogation of the common right. This rule is particularly applicable where there is an alleged delegation of the power. As a result of strict construction, the power itself must be clearly expressed by the statute or necessarily implied . . . * * *." However, we consider the implication of the language in the act to be against appellants' interpretation. We do not feel that the authority to "sell, mortgage, or encumber" is of greater magnitude than the power or authority of eminent domain. Since the act clearly limits the boards' authority in the former respect, we are unable to conclude that the legislature intended to confer the power of eminent domain to the commissioners. That there was extreme doubt concerning such authority being vested in the board is

shown by the fact that the 1957 legislature, through Act 269[5], gave to the Board of Commissioners such authority[6].

On the whole case, we find no reversible error.   Affirmed.

[5] "An Act Providing for the Condemnation of Property by Municipal Water Works Systems and For Other Purposes."

[6] "Section 2.   A municipality operating a waterworks system under the provisions of this Act shall have the right to acquire any property useful for municipal waterworks purposes by following the eminent domain proceedings herein set forth.   A municipality's right of eminent domain shall be exercised by the *operating authority of the municipal waterworks system.*"   (Emphasis supplied.)