CITY OF OSCEOLA *v.* STELLA C. WHISTLE ET AL

5-4133                                      410 S. W. 2d 393

Opinion delivered December 12, 1966
[Rehearing denied February 6, 1967.]

*Mitchell D. Moore* and *Smith, Williams, Friday &
Bowen* (By *Herschel H. Friday*), for appellant.

*Marcus Evrard* and *Oscar Fendler,* for appellee.

GEORGE ROSE SMITH, Justice. The single question
here is whether the city of Osceola has the power to
condemn land beyond its city limits as a right-of-way
for an electric transmission line. The chancellor held
that the power does not exist and accordingly enjoined
the city from attempting to condemn the property of
the plaintiffs, now the appellees.

All the facts were stipulated. For many years
Osceola has owned and operated a producing and dis-
tributing electric system, furnishing electricity to its
citizens and to others outside the city. In 1965 the city
executed a contract by which it was to purchase electri-
cal power from the Southwestern Power Administra-
tion, an agency of the federal government. The city has
issued revenue bonds to pay for the construction of a
new transmission line extending about fifty miles from
Osceola to a point near Jonesboro, which is to be the
place of delivery of the SPA power.

The proposed line will cross the plaintiffs' prop-
erty, which lies outside the city limits of Osceola. The
city failed in its efforts to purchase the needed right-
of-way across the property and was about to file a
condemnation proceeding when the plaintiffs brought
these suits, consolidated below, to enjoin the city from
instituting such a proceeding. The parties agree that a
justiciable issue is presented.

There is no controversy about the abstract princi-
ples of law that govern a case of this kind. With re-
spect to the powers of a municipality we quoted Judge
Dillon's familiar recapitulation in *Cumnock* v. *City of
Little Rock,* 154 Ark. 471, 243 S. W. 57, 25 A. L. R.
608 (1922) : ''It is a general and undisputed proposition
of law that a municipal corporation possesses and can

exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the accomplishment of the declared objects and purposes of the corporation, not simply convenient, but indispensable. Any fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied."

The rule of strict construction is especially applicable to statutes conferring the power of eminent domain, as the exercise of that power can entail harsh consequences to the landowner. "The authority for the taking of private property for public use should be clearly expressed and the statute strictly construed." *City of Little Rock* v. *Sawyer,* 228 Ark. 516, 309 S. W. 2d 30 (1958).

Here the city of Osceola first insists that by statute municipalities in Arkansas have expressly been given the power to condemn land outside the city limits as a right-of-way for electric transmission lines. Before examining the statutes that are cited we point out that in some instances the legislature has specifically authorized a city to condemn property outside its geographical limits. Such unmistakable delegations of power exist with reference to natural gas transmission lines, Ark. Stat. Ann. § 19-4813 (Repl. 1956), water supplies, § 35-902 (Repl. 1962), and public parks, § 35-901. We attach some significance to the fact that the legislature has seen fit in those instances to leave no doubt about its intention to permit the city to condemn property beyond its corporate limits.

There is no similar clarity of purpose in the statutes relied upon by the appellants. Counsel assert that an express delegation of the authority now claimed is to be found in any one of three sections of the compiled statutes. We are unable to agree with this contention.

First is Section 35-902, which was originally part of a comprehensive 1875 statute pertaining to municipalities. This is the language relied upon: "The right and power of eminent domain is hereby conferred upon municipal corporations to enter upon, take and condemn private property for the construction of wharves, levees, parks, squares, market places, or other lawful purposes." Construing the statute strictly, as we must, we cannot read into the phrase, "or other lawful purposes," the delegation of authority now contended for by the city. This sentence was added to the statute by Act 155 of 1935, which dealt primarily with municipal waterworks. In the 1935 act the legislature specifically provided that property for a waterworks might be condemned in a different county from that of the municipal corporation. Thus if there is any inference to be drawn from the 1935 amendment, it would be that the legislature meant for this extraterritorial authority to be limited to waterworks property.

Second is Section 19-2313, which is derived from the same 1875 statute. This section confers the power of eminent domain for the purpose, among other things, of lighting streets, alleys, public grounds, wharves, landing places, and market places. All these places are ordinarily within the city. Again construing the act strictly, we are not convinced that the legislature chose its language for the purpose of conferring the power now claimed by the city.

Third is Section 35-401. This was the first section of an 1895 act which, as we interpret it, dealt exclusively with waterworks. The act was amended in 1907. As we attribute significance to the amendment we are enclosing the amendatory language in brackets: "All municipal corporations in this State, and all corporations organized for the purpose of supplying any town, city or village in this State, or the inhabitants thereof with water, [or with electrical power, generated by water, for supplying such city, town or village, with such electricity as may be required for lighting same, operating ma-

chinery or running street cars, or other cars on tracks for public purposes only], are hereby authorized to exercise the power of eminent domain, to condemn, take and use private property for the use of such corporations when necessary or convenient to carry out the purposes and objects of said corporations.'' Section 6 of the original 1895 statute recognized the possibility that the land to be condemned might lie in more than one county.

Counsel for the appellant rely primarily upon the words that we have bracketed, which were added in 1907, as a basis for their contention that the city may condemn land outside its corporate limits to acquire electrical power generated by water, as the SPA power is said to be. We do not think the statute, strictly construed, to be susceptible of that interpretation. By the original act both municipal corporations and private corporations organized for the purpose of supplying cities with water were given the power of condemnation. The bracketed language that was added in 1907 was inserted in such a way as to be applicable only to the private corporations, not to the municipalities. The opening phrase in the amendatory language, ''or with electric power,'' makes a complete and intelligible sentence only if it refers back to corporations organized to supply a municipality or its inhabitants with such power. It is impossible to connect this newly added clause with the opening phrase in the original act, ''All municipal corporations . . .''

Thus we find no express statutory delegation of the power to condemn the right-of-way in question. Counsel for the appellant argue alternatively that the power exists under Judge Dillon's third category, as an essential and indispensable accessory to the city's express power to operate a municipally owned light plant. The trouble is, there is not a line of proof to support this contention. Whether it is necessary for the city to run a transmission line for a distance of forty-five miles for the acquisition of electric power is a fact question upon which the record is silent.

During the oral argument it was suggested by counsel for the city that, since the appellees were the plaintiffs in the case, they had the burden of proving that the construction of the proposed power line was *not* essential and indispensable to the operation of the municipal plant. This contention is not tenable. The plaintiffs made a prima facie case by showing that there was no express or implied statutory authority for the condemnation of their land. Seldom does the law require one to assume the burden of proving the negative. We regard the city's present contention as an affirmative defense peculiarly within its own knowledge and appropriately one upon which it had the burden of proof.

Affirmed.

Mc.FADDIN, J., dissents.

ED. F. McFADDIN, Justice, dissenting. I respectfully dissent from the Majority because I am firmly of the opinion that the decree should be reversed and we should decide that the City of Osceola has the power to condemn land beyond its city limits as a right of way for an electric transmission line.

At the outset I desire to mention that this case was tried on stipulated facts, and I copy certain pertinent paragraphs of the stipulation:

"I.    Osceola is a city of the First Class. It has owned and operated an electrical producing and distribution system for many years. Its electrical system has furnished electricity to citizens living within the City, as well as persons living beyond the City, as well as persons living beyond the city limits.[1]

"II.   In order to obtain electrical power, the City

[1]Ark. Stat. Ann. § 73-264 (Repl. 1962) allows municipalities, with the approval of the Public Service Commission, to extend service to the rural territories contiguous to the municipality.

of Osceola in 1965 entered into a contract with the Southwestern Power Administration.

"III. The City of Osceola, by Ordinance No. 574, has authorized the issuance of Electric Light and Power Revenue Bonds, and has issued such bonds, receiving the proceeds therefrom in the approximate amount of $1,600,000.00.

"IV. In order to obtain the electrical power under the said contract, the City of Osceola has determined that it will construct and operate a new electrical transmission line extending about fifty miles from Osceola across lands in Mississippi and Craighead Counties, Arkansas, to tie on to the source of power belonging to Southwestern Power Administration near Jonesboro, Arkansas. . . .

"IX. The sole question presented for determination is whether or not the City of Osceola, Arkansas, a city of the First Class, has the power under the Constitution and the laws of Arkansas to condemn land for a right-of-way across property owned by the plaintiffs and which is situated outside the city limits of Osceola, for use in the construction of an electrical transmission line from Osceola, Arkansas to a connecting point near Jonesboro, Arkansas, in order to fulfill the City's contract with Southwestern Power Administration to procure electrical power for the city and its inhabitants."

There are several reasons for my conclusions, but I will discuss only a few of them.

I.

Regardless of other provisions of the law, I am thoroughly convinced that Ark. Stat. Ann. § 35-401

(Repl. 1962) gives the City the power of eminent domain here sought. This section is Section 1 of Act No. 126 of 1895, as amended by Act No. 130 of 1907. Act No. 126 of 1895 was captioned, "An Act Authorizing Municipal Corporations And Other Corporations To Exercise Certain Privileges, And For Other Purposes." The Act consisted of a total of nine sections. The only section that has been amended is Section 1 of the Act, which, as amended, is now Ark. Stat. Ann. § 35-401. Sections 2 to 8 of the Act 126 of 1895 have remained unamended and are now found in Ark. Stat. Ann. §§ 35-402 to 35-408, inclusive.

It must be admitted that the Act No. 126 of 1895, as originally passed, was to give municipal corporations and other corporations engaged in supplying water, the power of eminent domain; and it was certainly intended by the Act No. 126 that this right of eminent domain would extend beyond the city limits of a municipality, because Section 6 of the Act, which is now Ark. Stat. Ann. § 35-406, states that if the property sought to be condemned is located in more than one county, then the jurisdiction for the condemnation proceeding will be in the county in which a part of the property may be located. Certainly, when the statute talked about condemnation proceeings in more than one county, it authorized condemnation proceedings for lands outside the city limits of the municipality. So if the City of Osceola had desired to condemn a right of way for water purposes under the Act No. 126 of 1895, it could certainly have exercised the power of eminent domain as to lands beyond its city limits.

Section 1 of Act No. 126 of 1895 was amended by Act No. 130 of 1907, and the caption of the Act 130 was: "An Act To Amend Section 2926 of Kirby's Digest." The Majority Opinion gives the original Section 1 of Act No. 126 and shows in brackets the amendatory language added by the Act No. 130 of 1907. I follow the same procedure, emphasizing the bracketed language:

"All municipal corporations in this State, and all

corporations organized for the purpose of supplying any town, city or village in this State, or the inhabitants thereof with water, [*or with electrical power generated by water, for supplying such city, town or village, with such electricity as may be required for lighting same, operating machinery or running street cars, or other cars on tracks for public purposes only,*] are hereby authorized to exercise the power of eminent domain, to condemn, take and use private property for the use of such corporations when necessary or convenient to carry out the purposes and objects of said corporations.''

Now, let us consider what was the effect of the amendment of 1907. It was certainly to include the right of eminent domain for acquiring right of ways for *electrical power generated by water.* Was this right of eminent domain for electrical purposes limited to public service corporations, as distinct from municipalities? That seems to be the view of the Majority, because the opinion recites: ''The bracketed language that was added in 1907 was inserted in such a way as to be applicable only to the private corporations, not to the municipalities.''

I disagree with the quoted sentence. The original Act No. 126 of 1895 said: ''All municipal corporations in this State, and all corporations organized for the purpose of supplying any town . . . with water . . . are hereby authorized . . .'' The amendatory section, as found in Act No. 130 of 1907, says, ''All municipal corporations in this State, and all corporations organized for the purpose of supplying any town, city or village in this State, or the inhabitants thereof, with water *or with electrical power generated by water* . . . are authorized . . .'' Notice the plural—''are authorized''—such clearly refers to ''*municipal corporations*'' as well as ''other corporations.''

If the amendatory sentence referred only to public service corporations, as distinct from municipal corpo-

rations, then the original Act No. 126 of 1895 applied only to public service corporations, as distinct from municipal corporations. If that be true, then why were the words, "All municipal corporations," ever included in either of the Acts? Unless the words, "or with electrical power generated by water," apply to municipalities, then neither does the water provision apply to municipal corporations; and so the Act, insofar as regards municipal corporations, would read, "All municipal corporations . . . are hereby authorized to exercise the power of eminent domain . . . ."

I cannot see the force of the Majority's reasoning as regards Ark. Stat. Ann. § 35-401. To me, such section clearly means that when a municipal corporation is seeking to get electrical power generated by water, then it has the right of eminent domain; and, as previously mentioned, Ark. Stat. Ann. § 35-406 says the eminent domain proceedings may be in any county in which the land is sought to be condemned; and that clearly means outside the city limits of the municipality.

That the City of Osceola in this case is seeking to get "electrical power generated by water" cannot be successfully denied. We take judicial notice of the federal statutes, and so we know that the Southwestern Power Administration is a part of the Federal Power Administration. U.S.C.A. Title 16, § 825 S concerns sale of "electric power and energy generated at reservoir projects"; and the next section of the U. S. Code (§ 825 S. 1) concerns the sale of power by the Southwestern Power Administration; so we know that the Southwestern Power Administration has "electric power generated by water."[2]

---

[2]On Page 267 of the United States Government Organization Manual of 1966-1967 there is this statement about the Southwestern Power Administration:
"CREATION AND AUTHORITY.—The Southwestern Power Administration was created by the Secretary of the Interior in 1943, to carry out the Secretary's responsibility for the sale and disposition of electric energy generated at certain projects constructed and

## II.

In the two concluding paragraphs of the Majority Opinion there is contained the discussion that there is no evidence in this case that the obtaining of this power is ''an essential and indispensable accessory to the city's express power to operate a municipally owned light plant.'' It was suggested in the oral argument that this point had not been developed because the single question was whether the City of Osceola has the power to exercise condemnation outside of its city limits. The Majority Opinion impliedly concedes that if the City had introduced evidence to show that the obtaining of this power was essential to the city's operation of the municipal plant, then such power of eminent domain would have existed. When the Majority Opinion makes this concession, it leads me to the conclusion that the Majority means that, under some circumstances, the City of Osceola would have the power of eminent domain outside of its city limits. And if the sole question in this case was (as stipulated) the power of Osceola to condemn, then this case should be further developed to see if the electrical power is *essential* in this case, because if it is es-

operated by the Federal Government. The Administration carries out, with respect to specific projects, functions assigned to the Secretary by the Flood Control Act of 1944 (58 Stat. 890; 16 U.S.C. 825s).

"OBJECTIVES.—The Southwestern Power Administration transmits and disposes of the surplus electric power and energy generated at the Federal reservoir projects in such manner as to encourage their most widespread use. To accomplish this, the Administration sets the lowest possible rates to consumers, consistent with sound business principles, and gives preference in the sale of such power and energy to public bodies and cooperatives.

"ACTIVITIES.—The Administration is designated as the agency to market available surplus electric power and energy generated at the following multiple purpose reservoir projects of the Department of the Army: Beaver, Blakely Mountain, Broken Bow, Bull Shoals, Dardanelle, DeGray, Denison, Eufaula, Fort Gibson, Greers Ferry, Kaysinger Bluff, Keystone, Robert S. Kerr, Narrows, Norfork, Sam Rayburn, Stockton, Table Rock, Tenkiller Ferry, Ozark Lock and Dam, and Whitney."

A case discussing Southwestern Power Administration is: *Kansas City Power & Light Co.* v. *Douglas McKay, Secretary of Interior*, 225 F. 2d 924.

sential, then Osceola has the power of eminent domain here sought.

However, I think there is already evidence in this record that electrical energy is essential to the City. By the provisions of Stipulations 1 to 4, previously copied herein, it was agreed that Osceola has had a municipal electrical power system for many years, but it has now, by ordinance, authorized the issuance of $1,600,000.00 worth of bonds in order to obtain the electrical power here sought. Surely when the City Council adopted an ordinance that it would expend $1,600,000.00 to get this power from the Southwestern Power Administration, it is rather strong evidence that the City needed the power. I cannot imagine that the City of Osceola would be spending any such sum unless it was necessary; so I think the stipulated facts constitute the evidence that this electrical power is essential and indispensable to the operation of the municipal plant.

## CONCLUSION

On the law, I maintain that Ark. Stat. Ann. § 35-401 gives Osceola the power of eminent domain here sought. On the facts, I maintain that the stipulation shows that this electrical power from the Southwestern Power Administration is essential and indispensable to the operation of the municipal plant. On either basis, I would reverse the Chancery Court.

There is one consoling thought for Osceola, and it is this: the Arkansas Legislature will be in session in a very short time, and may—and I predict will—give municipalities the same power of eminent domain that public service corporations already have.