Eugene M. PFEIFER, III; Citizens Fidelity Insurance Company; and Pulaski County, Arkansas *v.* CITY of LITTLE ROCK

01–302 57 S.W.3d 714

Supreme Court of Arkansas
Opinion delivered November 1, 2001

*Eichenbaum, Lile & Hester, P.A.,* by: *Christopher O. Parker,* for appellant.

*Thomas M. Carpenter,* Office of the City Attorney, for appellee.

Jim Hannah, Justice. Appellant Eugene M. Pfeifer, III, appeals the Pulaski County Chancery Court's grant of summary judgment to Appellee City of Little Rock ("the City") in this eminent domain proceeding taking approximately 2.9 acres of Pfeifer's property for a fair market value of $400,000 for part of the park grounds for the Clinton Presidential Library, Complex, and Park District. The crux of Pfeifer's argument on appeal is that the City did not need all of his property for the library and complex grounds and, that even if all of the property was needed, the creation of the library and complex is not a proper statutory purpose for taking the property. We affirm.

The idea for the creation of the library and complex began soon after President William J. Clinton was elected to the presidency in 1992. At that time, a group of his supporters began work to find property in Arkansas to establish the Clinton Presidential Center to house the presidential letters and archives from his administration. This Clinton Presidential Library Study Commission (the Commission) suggested approximately thirty sites in Little Rock and North Little Rock as possible locations for the complex and surrounding park areas, and ultimately decided on a location along the river front in downtown Little Rock east of Interstate 30. In relation to this proposal, the City began considering this location for a park area to be used in conjunction with the presidential library complex.

Ultimately, the City issued 10.5 million dollars in bonds to acquire the proposed property and prepare the property as "site ready" for building in anticipation that the William J. Clinton Presidential Library Foundation (the Foundation), the private funding arm of the library and complex project, would properly bid to lease a portion of the park area on which to build the library and

complex buildings. The site encompasses approximately 26.6 acres of land. According to Little Rock Mayor Jim Dailey's deposition testimony, while the Foundation and the City had not made a "commitment" to the project, it was anticipated that this would be the project that would anchor the proposed park grounds. This was further reflected in a letter from James L. "Skip" Rutherford, President of the Foundation, who wrote the City on April 21, 1998, confirming that the library would be located in Little Rock and outlining tentative plans for the lease of the property by the Foundation and the federal government. The letter indicated that the Foundation would lease a portion of the property from the City for ninety-nine years at the rate of $1.00 per year, and that federal government could use the property in perpetuity without transfer of title. However, Dailey also indicated that the City itself was not preparing any plans for a library complex nor consulting with any of the Foundation's planners as Dailey indicated that the City's sole purpose was acquiring the property for the park, with additional plans to follow later.

During 1997, 1998, and 1999, the City passed several resolutions affecting the river front property included in the proposed park areas. In Resolution 10,125 passed on November 7, 1997, the City declared a moratorium for a period of six months to stop the issuance of building permits or acceptance of rezoning applications for "the area of the Clinton Presidential Library" and for other purposes. The description of "The Clinton Presidential Park District" described the following general area as shown in the attached Exhibit B to that Resolution:

> South of the Arkansas River, east of Interstate 30, north of the mid-line between 6th Street and Capitol Avenue west of Pepper Street and north of Capitol Avenue east of Pepper Street, and west of Pepper Street south of Capitol Avenue and west of Bond Street north of Capitol Avenue.

The larger map in Exhibit B contains the described property in the resolution. Two other maps were also included with the resolution, including the map in Exhibit A entitled "Proposed Clinton Presidential Library" making up a portion of the total 26 acres proposed to be taken by the City. Resolution 10,374, passed on October 6, 1998, continued the moratorium established in Resolution 10,125 with the same property description but lacking the larger map detailing that property description attached as Exhibit B in the 1997 moratorium resolution. Finally, on April 6, 1999, the City again continued the moratorium in Resolution 10,518, but amended the

boundaries as "South of the Arkansas River, east of Interstate 30, north of East 4th Street and west of John Street" as indicated in that resolution's Exhibit B. This amended description minimized the moratorium area; however, in all of these resolutions, the moratorium area continually included all of Pfeifer's property.

The City began acquiring property in 1998 and 1999. On December 15, 1998, the City passed Resolution 10,441 providing authorization to begin eminent domain proceedings. This resolution named three parcels of property, one of which was listed as "115 East Second Street, Eugene M. Pfeifer, III." Several months later after unsuccessfully negotiating with Pfeifer for the sale of his entire tract of property, the City filed a Complaint in Eminent Domain on July 30, 1999, claiming condemnation power over Pfeifer's property totaling 2.944 acres along the southeast border of the proposed library complex site. In its complaint, the City indicated that it was acquiring the property for "the purpose of construction and operation of a public park and other lawful and permitted purposes." Attached to the complaint was a description of Pfeifer's property titled "(The former) MAY SUPPLY COMPANY PROPERTY, 115 East Second Street." The description of the property includes two tracts. The first tract contained 29,109 square feet or .668 acres more or less, and the second tract contained 99,138 square feet or 2.276 acres more or less. This constituted all of Pfeifer's property, and the old May Supply Company Building still exists on the entire piece of property. Pfeifer answered on August 17, 1999, disputing the purpose for which the City asserted for taking the property. Pfeifer did concede, however, that the $400,000 deposited with the court constituted the fair market value of the property.

Per Pfeifer's request, the action was transferred from circuit to chancery court on September 22, 1999, for a determination of whether the Arkansas Legislature delegated to the City the power to condemn private property for the purpose of providing a site for the construction of a private facility. On December 22, 1999, Pfeifer filed a motion for summary judgment arguing that the true purpose of the condemnation proceeding was for the City to acquire property for a "building ready" site for the complex, and that this purpose is not one which the Arkansas Legislature delegated to the City for purposes of eminent domain. Pfeifer argued that, from the beginning, the acquisition of property was not for a city park, but rather only for the complex as indicated by the City's complete lack of planning for the use of the property outside of the plans for the complex. On February 4, 2000, the City filed a cross-

motion for summary judgment, arguing that the purpose for which the City wanted the land is a proper public purpose in that the City may take property to establish a park and for other proper purposes. Further, the City argued that Pfeifer's issues are not ripe for review because no final determination had been made about any issues related to the complex or its location. The trial court issued its decision on May 4, 2000, denying both motions for summary judgment. The court determined that while the City claimed that the property would be used for a public park, the City issued bonds to finance the property to be "site ready" for the complex although the City also represented that it would lease the property in an open-bid process despite the Rutherford's proposal that the Foundation would lease the property. As such, the court found that because these facts were contradictory and because the City had provided no plans for its intended use of the park, the court could not determine whether the City would, in fact, use the land for a public park, although the concept of a public park might incorporate such structures and purposes as those proposed in the complex and surrounding grounds. Furthermore, the court also indicated that the parties missed the point as to whether the taking was for "other lawful purposes" as allowed under Ark. Code Ann. § 18-15-301(a) (Supp. 2001).

Given this ruling by the court, the City amended its complaint on May 12, 2000, indicating that the statutory grant of power of eminent domain to the City encompassed such an act of condemning property to create a park, to be known as the William Jefferson Clinton Presidential Park, which is intended to include the library and museum as well as other structures and recreational and educational facilities. The City more fully declared its intentions to the property including that it intended to maintain ownership while leasing portions to selected entities. The City once again attached the description of all of Pfeifer's property as an exhibit to the complaint. Pfeifer answered on May 31, 2000, and denied that the proposed purpose is proper, that all of his property is necessary to accomplish the proposed purpose, that use of the property as a residence is a public purpose, and that the cited statutes allow the City to condemn his property for such proposed purposes. Pfeifer once again conceded that $400,000 was the fair-market value of the property.

On September 15, 2000, the City filed a renewed motion for summary judgment arguing that Ark. Code Ann. § 18-15-301 allows the City to take Pfeifer's property for the purpose of constructing the park which will include the library and musuem and

other educational and recreational facilities. Pfeifer did not file a cross-motion but instead filed a response arguing that there are questions of fact as to the true purpose behind the condemnation proceedings, and that such power of condemnation for these purposes has not been conferred to the City.

A hearing was held on the City's motion on November 3, 2000. Following the hearing, the court issued its decision granting the City's motion for summary judgment on November 13, 2000, finding that the true intent of the taking of the 26.6 acres is for the purpose of creating a park which will include approximately 4 acres of buildings and other structures. The court specifically found that the evidence supported a finding that a "park" can include such a proposal, and that other Little Rock parks include structures such as War Memorial Stadium, MacArthur Park's buildings, the zoo, and the River Market addition. The court found that such a park and complex serve a public purpose, enhance the quality of urban life, and create an educational and cultural center for the citizens of the city and of the state. As such, the burden shifted to Pfeifer to show that there has been fraud, bad faith, or a gross abuse of discretion by the City, and that Pfeifer failed to do that. The court determined that the City does have the authority to lease the park property to a private entity under Ark. Code Ann. § 22-4-503 (Repl. 1996) where the proper statutory process is followed by the City. Finally, the court determined that the appraisal made of Pfeifer's property included all parcels, including the south one-third of the property, and that this property was contained in the fair-market value assessment of $400,000 as agreed upon by Pfeifer.

Pfeifer filed his notice of appeal from summary judgment on November 17, 2000. The court issued an additional "Judgment" on December 15, 2000, incorporating its previous summary judgment and finding that the $400,000 in deposit with the court is the proper value of the property and that the money should be released. Furthermore, the court found that the title in land should be vested with the City in fee simple absolute, and that Pfeifer should pay taxes on the property to the date of the judgment. Finally, the court dismissed with prejudice all claims and counterclaims. Pfeifer filed his supplemental notice of appeal on December 21, 2000.

 As we have often stated, summary judgment is to be granted by a trial court if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ark. R.

Civ. P. 56; *Estate of Donley v. Pace Indus.*, 336 Ark. 101, 984 S.W.2d 421 (1999); *Mashburn v. Meeker Sharkey Financial Group, Inc.*, 339 Ark. 411, 5 S.W.3d 469 (1999). Once the moving party has established a *prima facie* entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* On appellate review, this court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. *Id.* This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. *Id.*

### I. Necessity of Taking All of Pfeifer's Property

In his first point on appeal, Pfeifer argues that the City never established the need to take all of his property for the creation of the presidential park, and that this lack of proof of necessity for taking his property for a public purpose leaves open a material question of fact to defeat summary judgment. Specifically, Pfeifer argues that a material issue of fact remains as to whether the City needed the southern one-third of his property south of Third Street. He argues that all of the documents and maps attached to the City's resolutions do not show that the presidential park extends south of Third Street into the south one-third of his property. Therefore, the City failed to show a need for the property, and whether such need exists is a material question of fact.

The City responds by noting that Resolution 10,441 authorizing the eminent domain proceedings and the complaint in eminent domain specifically listed Pfeifer's entire property as that to be taken, and Pfeifer conceded that $400,000 was a fair-market price for his entire property. The City notes that the burden is on Pfeifer to show that the property at issue is unnecessary, and Pfeifer failed to meet proof with proof to rebut the City's contention that it needs the property for the presidential park. The City notes that, as a general rule, Pfeifer must show that there was fraud, bad faith, or gross abuse of discretion in the City's choice of property, and, again, Pfeifer fails to carry this burden. Rather, the City argues that although Pfeifer offers testimony from City planners that it appeared that his property would be cut in half, Resolution 10,441, the complaint, and offer of compensation indicate that the City sought to take his entire property, that prior to the condemnation

lawsuit Pfeifer negotiated the sale of his entire tract of property, and that the ordinances and maps, while arguably could have been more carefully drawn, never indicated that the properties shown were the total needed for the project.

■ ■ The power of eminent domain is an attribute of, and inherent in, a sovereign state. Ark. Const. art 2, § 23; *City of Little Rock v. Raines*, 241 Ark. 1071, 411 S.W.2d 486 (1967); *Young v. City of Gurdon*, 169 Ark. 399, 275 S. W. 890; *City of Little Rock v. Sawyer*, 228 Ark. 516, 309 S.W.2d 30. Article 2, section 22, of the Arkansas Constitution provides that "[t]he right of property is before and higher than any constitutional sanction; and private property shall not be taken, appropriated or damaged for public use, without just compensation therefor."

■ Statutes that relate to the power of eminent domain should be strictly construed in favor of the landowner, *see Columbia County Rural Dev. Auth. v. Hudgens*, 283 Ark. 415, 678 S.W.2d 324 (1984); *Loyd v. Southwest Ark. Util. Corp.*, 264 Ark. 818, 580 S.W.2d 935 (1979), and no more property of a private individual, and no greater interest therein, can be condemned and set apart for public use than is absolutely necessary. *See Selle v. City of Fayetteville*, 207 Ark. 966, 184 S.W.2d 58 (1944). The authority for the taking of private property for public use should be clearly expressed. *Sawyer, supra.* Broad discretion is vested in those to whom the power of eminent domain is delegated. *State Highway Comm'n v. Saline County*, 205 Ark. 860, 171 S.W.2d 60 (1943). In *Gray v. Ouachita Creek Watershed Dist.*, 234 Ark. 181, 351 S.W.2d 142 (1961), the supreme court explained:

> The State, by conferring on the District the power of eminent domain, necessarily left largely to the discretion of the District the location and area of the land to be taken. And one seeking to show that the taking has been arbitrary or excessive shoulders a heavy burden of proof in the attempt to persuade the Court to overrule the District's judgment. *Burford v. Upton*, 232 Ark. 456, 338 S.W.2d 929; *Woolard v. State Hwy. Comm.*, 220 Ark. 731, 249 S.W.2d 564; *State Game & Fish Comm. v. Hornaday*, 219 Ark. 184, 242 S.W.2d 342; *State Hwy. Comm. v. Saline County*, 205 Ark. 860, 171 S.W.2d 60; and *Patterson Orchard Co. v. S.W. Ark. Util. Corp.*, 179 Ark. 1029, 18 S.W.2d 1028.

*Gray*, 234 Ark. at 183-85. This court stated in *State Highway Com. v. Saline County, supra,* that:

> A broad discretion is necessarily vested in those to whom the power of eminent domain is delegated, in determining what property is necessary for the public purpose, with respect to the particular route, line, or location of the proposed work or improvement; and the general rule is that the courts will not disturb their action in the absence of fraud, bad faith, or gross abuse of discretion. The landowner may not object merely because some other location might have been made or some other property obtained which would have been suitable for the purpose.

*State Highway Com. v. Saline County*, 205 Ark. at 863. In determining whether the taking of property is necessary for public use, not only the present demands of the public, but those which may be fairly anticipated in the future, may be considered. *Woollard v. Ark. State Highway Comm'n*, 220 Ark. 731, 249 S.W.2d 564 (1952) (citing *Rindge Co. v. County of Los Angeles*, 262 U.S. 700, 67 L.Ed. 1186, 43 Sup. Ct. 689 (1923)).

 The entry upon another's land is not a right to be assumed by anyone — private citizen or public agency. *Robinson v. Game & Fish Comm'n*, 263 Ark. 462, 565 S.W.2d 433 (1978). A public entity's right of eminent domain is a constitutional privilege granted with limitations. *Id.* First, there must be established the need for taking for public use or purpose. "This is a judicial question which the owner has a right to have determined by the courts." *Arkansas State Highway Comm. v. Alcott*, 260 Ark. 225, 539 S.W.2d 432 (1976). Second, the condemnation of land must be according to the law. *Robinson, supra.* And, in reviewing the necessity of the taking for public use, the legislative determination is subject to review in cases of fraud, bad faith, or gross abuse of discretion. *Woollard, supra.*

*Robinson v. Arkansas Game & Fish Commission* was decided in 1978 after the court decided *Woollard v. State Highway Commission* in 1952. In *Woollard*, the court noted not only that the taking of property must be for a permissible purpose, but also that the judiciary may review in cases of fraud, bad faith, and gross abuse of discretion. However, in *Robinson,* the court only focused on the necessity and lawfulness of the taking, seemingly in conflict with the earlier *Woollard* decision. These cases, however, are harmonious in light of their facts. In *Robinson*, the court reviewed the Game and Fish Commission's restraining orders, which had since expired, allowing Commission employees to enter onto private property to survey for a lake. While no "taking" had yet occurred, this court addressed the issue to avoid future litigation and found that the

statutory scheme required the Commission to obtain a temporary easement, which it had not done, prior to entering onto private land. This court did not conduct a review for fraud, bad faith, or gross abuse of discretion, but instead found that because the Commission had not complied with the statutory requirements to allow its employees to enter onto private property, such a taking could not be lawful until those conditions were met. That case was quite different from *Woollard* wherein the State Highway Department had already begun relocation of a twelve-mile segment of highway before landowners, whose property was being condemned, sought an injunction to enjoin the State Highway Department from relocating the highway. The *Woollard* court not only considered the necessity for the taking but also considered whether the decision to relocate the highway was fraudulent, in bad faith, or a gross abuse of discretion. This added consideration is proper where, as here, the eminent domain proceedings have lawfully begun according to statutory requirements.

In order to prevail on this issue, Pfeifer had to meet proof with proof to show that the City did not need all of his property and that the City abused its discretion, committed fraud, or acted in bad faith in condemning his property for its anticipated purpose of creating a presidential park. Because the City is given broad discretion in deciding what property is necessary now and for the future, *see Woollard, supra,* we believe that the City's proposal and supporting documentation make it clear that Pfeifer's entire property was properly taken by the City for the presidential park.

The proof provided by the City in its motion for summary judgment clearly shows that it needed all of Pfeifer's property for the park. While Pfeifer is correct in noting that some of the maps attached to various resolutions passed by the City do not appear to include the south one-third of his property south of Third Street as part of the general park outline, the City's additional documentation more than establishes that the City anticipated the need for all of Pfeifer's property in the park project. In looking at all of the maps provided with each resolution passed by the City, and in the other schematics provided by the parties, it appears that the City and the architects for the Foundation anticipated that this one-third portion of Pfeifer's property would be part of the park grounds. First, Pfeifer cites in his brief that the maps provided with Resolutions 10,125, 10,374, and 10,518 never show that proposed land condemnation would go further south than Third Street. However, in looking at the maps attached to these Resolutions, the City did two things. First, the City created the Clinton Presidential

Park District in Resolution 10,125 described by certain boundaries as:

> South of the Arkansas River, east of Interstate 30, north of the mid-line between 6th Street and Capitol Avenue west of Pepper Street and north of Capitol Avenue east of Pepper Street, and west of Pepper Street south of Capitol Avenue and west of Bond Street north of Capitol Avenue.

This map clearly encompasses Pfeifer's property in the building moratorium area. In the two later resolutions, the City continued the building moratorium in the district, and ultimately condensed the district area in Resolution 10,518 to the following area "generally described" as:

> South of the Arkansas River, east of Interstate 30, north of East 4th Street and west of John Street.

While the "district" area definitely encompasses Pfeifer's property, the actual park area is not as clear. The City apparently mapped out a "general" boundary for the presidential park, which, as Pfeifer notes, appears not to extend south of Third Street. However, none of the resolutions state that this "park" area is set in stone, and, in fact, the resolutions clearly indicate that the area is a general area. In addition, in looking at the drawing created by the architects hired by the Foundation, all of Pfeifer's property is included in the park area. Because the City was clearly acquiring the property in hopes that the Foundation would lease the land, this drawing is particularly important in establishing what land is necessary to meet the Foundation's needs.

In addition to the maps detailing the general area of the presidential park, the City passed Resolution 10,441 in which the City approved the commencement of eminent domain proceedings to acquire, among others, Pfeifer's property located at 115 East Second Street. While Pfeifer argued that this address only covered the north two-thirds of the property, his attorney admitted at oral arguments in this case that the May Supply Company building at that address rests not only on the north two-thirds of the property, but also on the south one-third of the property, making it difficult to "split" acquisition of the property into two parcels. In fact, this particular piece of information seriously undermines Pfeifer's contention that the City did not need all of his property because dividing the property according to Pfeifer's theory would cause the building to be split in half. Furthermore, Pfeifer negotiated with the City for

sale of the entire tract of land prior to the City's filing of the complaint in eminent domain, which included all of the property for acquisition. Pfeifer also admitted in his answer and amended answer, and does not dispute now, that $400,000 is the fair-market value for the entire tract of land.

█ Clearly, the City has consistently stated a need for Pfeifer's property. Whether Pfeifer thinks the property was necessary is not the issue. Rather, whether the City believes that the property is necessary to accomplish the purposes of creating a park area, which it may do, is the issue. Given the broad discretion provided to the City, Pfeifer failed to meet proof with proof that the City wrongfully condemned his property under eminent domain proceedings.

## II. Legislative Grant of Authority to the City to Take Pfeifer's Property

In his second point on appeal, Pfeifer argues that the City did not have the authority to condemn his property under the guise of creating a city park only to then lease portions of the property to a private entity and the federal government for a library and meeting complex. Despite Pfeifer's contention, the real question is whether the City's assertion that this land will be a park encompasses the idea that the presidential library and complex can also sit on this site as part of the city park.

█ A municipality's ability to act is derived only from those powers directly granted it by the state legislature or through the state constitution. This court stated in *Raines, supra*:

> Cities are creatures of the state to aid it in the regulation and administration of local affairs. *Woods v. Haas*, 229 Ark. 1007, 320 S.W.2d 655; *Portis v. Board of Public Utilities of Lepanto*, 213 Ark. 201, 209 S.W.2d 864; *City of Hot Springs v. Gray*, 215 Ark. 243, 219 S.W.2d 930. They have no inherent powers and can exercise only (1) those expressly given them by the state through the constitution or by legislative grant, (2) those necessarily implied for the purposes of, or incident to, these express powers and (3) those indispensable (not merely convenient) to their objects and purposes. *City of Piggott v. Eblen*, 236 Ark. 390, 366 S.W.2d 192; *McClendon v. City of Hope*, 217 Ark. 367, 230 S.W.2d 57; *Bain v. Ft. Smith Light & Traction. Co.*, 116 Ark. 125, 172 S.W. 843, LRA 1915 D 1021; *Laprairie v. City of Hot Springs*, 124 Ark. 346, 187 S.W. 442; *City of Argenta v. Keath*, 130 Ark. 334, 197 S.W. 686, LRA 1918 B 888;

*Cumnock v. City of Little Rock*, 154 Ark. 471, 243 S.W. 57, 25 ALR 608; *Arkansas Utilities Co. v. City of Paragould*, 200 Ark. 1051, 143 S.W.2d 11; *Williams v. Dent*, 207 Ark. 440, 181 S.W.2d 29; *Deaderick v. Parker*, 211 Ark. 394, 450, 200 S.W.2d 787.

Cities may act legally only within the powers derived from or delegated by the constitution and statutes. *Neal v. City of Morrilton*, 192 Ark. 450, 92 S.W.2d 208. The validity of their ordinances depends on the authority granted by the constitution or by the legislature. *Incorporated Town of Paris v. Hall* 131 Ark. 104, 198 S.W. 705; *Nesler v. City of Paragould*, 187 Ark. 177, 58 S.W.2d 677; *Bennett v. City of Hope*, 204 Ark. 147, 161 S.W.2d 186; *City of Stuttgart v. Strait*, 212 Ark. 126, 205 S.W.2d 35.

*Raines*, 241 Ark. at 1078. Because cities only have such power as given them by the legislature or by the constitution, we turn to the applicable statutes to determine whether the City's actions here in taking Pfeifer's property was a proper exercise of eminent domain. Ark. Code Ann. § 18-15-301, *"Municipal corporations — Power to condemn generally,"* confers upon a municipality the ability to condemn private property through eminent domain proceedings for the creation of a park, and states in pertinent part:

(a) The right and power of eminent domain is conferred upon municipal corporations to enter upon, take, and condemn private property for the construction of wharves, levees, parks, squares, market places, or other lawful purposes. . . .

Once the property is acquired through eminent domain to create a park or other municipal work, Ark. Code Ann. § 22-4-501 (Repl. 1996) and Ark. Code Ann. § 14-269-103 (Repl. 1998) allow a municipality to manage the property for the stated purpose in a number of different ways. Arkansas Code Annotated § 22-4-501, *"Disposition of property authorized,"* states in pertinent part:

(b)(1) Any municipality in this state shall have the authority to lease to any individual, firm, or corporation municipal property comprising parks, playgrounds, golf courses, swimming pools, or other property which have been dedicated to a public use for recreational or park purposes, on such terms and conditions as may be desirable or necessary.

(2) Any municipality is also authorized to lease municipally-owned lands and facilities to a community college board to be used for educational purposes.

(3) Any lease under this subsection shall be for a period not to exceed ninety-nine (99) years.

Arkansas Code Annotated § 14-269-103, "*General authority — Agreements with federal agencies — Condemnation Proceedings*," states:

(a) Any municipality in this state is authorized to own, acquire, construct, reconstruct, extend, equip, improve, operate, maintain, sell, lease, contract concerning, or otherwise deal in or dispose of any land, buildings, improvements, or facilities of any and every nature whatever necessary or desirable for the developing and providing of public parks and facilities within or near the municipality including, without limitation, recreation areas, stadiums, auditoriums, arts and crafts centers, folklore centers, interpretative centers, camping areas, and other facilities so as to provide for the recreation and cultural needs of its inhabitants and to stimulate and encourage the economic growth of the municipality and its inhabitants; each such undertaking by a municipality shall sometimes be referred to in this subchapter as a "project".

(b)(1) Any municipality in this state shall have the authority to lease to any individual, firm, or corporation municipal property comprising parks, playgrounds, golf courses, swimming pools, or other property which has been dedicated to a public use for recreational or park purposes, on such terms and conditions as may be desirable or necessary.

(2) Any municipality is also authorized to lease municipally owned lands and facilities to a community college board to be used for educational purposes.

(3) Any lease under this subsection shall be for a period not to exceed ninety-nine (99) years.

***

(c) Municipalities are authorized to enter into and carry out appropriate agreements with any agency of the Government of the United States of America, hereinafter referred to as "government," pertaining to the accomplishment of the purposes authorized by this subchapter including, without limitation, loan agreements with the government for the borrowing of money and agreements pertaining to grants from the government.

Perhaps the greatest authority for condemning Pfeifer's property in this case is an additional provision in this statute, which states:

> (d)(1) In the event that necessary lands needed for the accomplishment of the purposes authorized by this subchapter cannot be acquired by negotiation, any municipality is authorized to acquire the needed lands by condemnation proceedings under the power of eminent domain.

Pfeifer argues that the court may look beyond the stated purpose of the condemnation — here, to create a park — to determine whether the City actually means to accomplish that goal or instead plans to fulfill some other unstated purpose. However, the chancery court posed the question best by asking whether the City can condemn property to create a park in which the Foundation, the federal government, the University of Arkansas system, or any other non-City entity can lease some of the property to accomplish their plans of a presidential library, park, and complex. And, considering the language of the above-cited statutes, the chancery court correctly found that the City can create a "park" in which the presidential complex, or any other public complex (assuming another entity is the successful bidder) exists.

Arkansas Code Annotated section 22-4-101 (Repl. 1996) defines a "park" as "any area within the state which by reason of location, natural features, scenic beauty, or historical interest possesses distinctive physical, aesthetic, intellectual, creative, and social values." While Pfeifer contends that the definition of a park cannot encompass a presidential library, archives, or complex, he again failed to meet proof with proof that the City's proposal for such a complex could not meet the definition of a "park." Rather, the City offered the affidavit of Bryan Day, Director of the Little Rock Parks Department, who indicated that the concept of a "park" can encompass many different ideas. Day, who is the President of the Arkansas Recreation Parks Association and on the Board of Trustees of the National Recreation and Parks Association, indicated that in Arkansas and other states, park properties include a variety of facilities and structures to serve a wide range of public needs and purposes. These include everything from football stadiums, such as War Memorial Field, to museums, planetariums, and theaters in parks such as San Diego, California's Balboa Park, and St. Louis, Missouri's Forest Park. Day also noted that should the proposed Presidential Library and Musuem buildings are ever abandoned, they

will revert to the City. Day also indicated that even if the Commission decided not to locate the Presidential Library and Complex at this site, the City would still create a park on this property.

Pfeifer particularly cites two cases, *Hampton v. Arkansas State Game & Fish Commission*, 218 Ark. 757, 238 S.W.2d 950 (1951), and *Arkansas Game & Fish Commission v. Gill*, 260 Ark. 140, 538 S.W.2d 32 (1976), for the propositions that 1) the City cannot state one purpose for the condemnation and then attempt to accomplish some other purpose, and 2) that the City cannot take property and then immediately resell it to a private entity.

In these two cases, the Game and Fish Commission claimed that it was attempting to improve or expand its conservation grounds in the Bayou Meto Wildlife Management area, a purpose allowed by statute, where, in reality, the Commission was really attempting to expand its hunting grounds, a purpose not allowed by statute. These cases, however, can be easily distinguished from the present case. First, the purpose proposed by the City to create a park and possibly lease some of the land to the Commission, the National Archives, or any other successful bidder is a purpose specifically anticipated under the controlling statutes. Second, from the start the City has proposed the park in anticipation that the presidential library and complex would be located on the grounds, assuming the Commission properly bids on the lease. This approach is unlike that in *Hampton* and *Gill* wherein the Game and Fish Commission stated one purpose for the condemnation but anticipated using the grounds for another purpose.

Pfeifer also argues that the City cannot take property that it later intends to resell to a private entity for a profit. In the case of *Selle v. City of Fayetteville*, 207 Ark. 966, 184 S.W.2d 58 (1944), this court noted that it becomes a claim of bad faith against a city if the landowner contends that the municipality intends to resell at a profit land it is attempting to condemn for the creation of an airport, a valid municipal work. The court in *Selle* did not reach the merits of that claim because the landowner did not raise the issue below to have it transferred to chancery court for those questions to be answered. However, the proposition remains that a municipality cannot claim one purpose for the use of the property and attempt to accomplish a different purpose, particularly when the hidden purpose is to condemn land and then resell it to a private entity.

■ By citing these cases, Pfeifer contends that the City's purpose to create a park to house the presidential library and complex cannot be accomplished because the City would have to sell the property to the National Archives and Records Administration (NARA). He cites NARA's proposed regulations which appear to require that, in order for the archives to be housed at any particular site, the property must be sold to the government or leased in perpetuity. Pfeifer, however, concedes that these regulations have not been adopted yet. Furthermore, because the bid process has not yet taken place, this issue currently is not before this court. Overall, this court presumes that public officials will act lawfully and sincerely in good faith in carrying out their duties, and that they will not engage in subterfuge to accomplish their goals. *Cotten v. Fooks*, 346 Ark. 130, 55 S.W.3d 290 (2001); *Commercial Printing Co. v. Rush*, 261 Ark. 468, 549 S.W.2d 790 (1977). The record does not reflect that the City has begun the bidding process to determine how and by whom the park property will be leased. Assuming it is the Foundation and the National Archives, the City will continue to remain under the obvious duty to follow the law and act in good faith in leasing the property to these entities or to any other successful bidder. Failure to do so only subjects the City to further litigation.

IMBER, J., not participating.