The Honorable Jim Guy Tucker Governor, State of Arkansas State Capitol Little Rock, Arkansas 72201
Dear Governor Tucker:
This is in response to your request for an opinion on your authority as Governor of the State of Arkansas to enter into and have the State perform obligations under an agreement (the "Agreement") with the Fish and Wildlife Service of the United States Department of the Interior (the "Service") pursuant to which (a) the State would donate[1] to the Service funds in amounts sufficient to enable the Service to reopen to the public all or part of the Felsenthal National Wildlife Refuge located in Arkansas (the "Refuge") during the period in which the Service, due to a lack of funds appropriated by Congress, would otherwise leave the Refuge closed to the public, and (b) the Service will use funds received from the State under the Agreement to reopen to the public all or part of the Refuge in accordance with the terms of the Agreement(s).
In connection with rendering this opinion, I have reviewed the Agreement between the State (signed by you as Governor) and the Service. The Agreement, however, does not specify the source of State funds which will be used to satisfy the Agreement. It is my understanding that you intend to use amounts appropriated by Act 177 of 1995 to the Governor's Miscellaneous Revolving Fund (or "Governor's Emergency Fund") to satisfy the Agreement. The procedures for the disbursement of this fund are set forth in A.C.A. § 19-2-404 (Repl. 1994).
The Agreement contains, among other things (including the agreement to provide funds), the State's agreement:
 To indemnify, save and hold harmless, and to provide complete cooperation with, as well as provide such assistance as may be required by the United States, with respect to any and all claims, lawsuits, damages, losses, judgments, worker's compensation claims, and expenses, including attorneys fees and litigation costs, arising out of, or from, or associated in any manner with any omission or activity as a result of the Service keeping open the Felsenthal Refuge under this Agreement. Provided, however, the State is not liable for any purchases or contracts entered into by the Service prior to the implementation of this Agreement.
Agreement, Article II.B.3.
It is my understanding that the indemnification required under Article II.B.3 will be supported by the procurement of an insurance policy in the amount of five million dollars (per occurrence and in the aggregate) which will be obtained to cover any potential claims, lawsuits, damages, losses, judgments, and expenses, including attorneys' fees and litigation fees, arising from the operation of the Refuge during the relevant period. It is also my understanding that a separate insurance policy will provide coverage for workers' compensation claims arising during the relevant periods. It is my understanding that the premiums for these insurance policies are also being paid from the amounts appropriated under Act 177 of 1995 (i.e., from the "Governor's Emergency Fund").
Two questions arise in analyzing whether the State of Arkansas (the Governor in particular) has the legal authority to enter into this Agreement. The first involves the legal authority of the Governor to donate or provide public funds to the Service from his "Emergency Fund." The second is whether the State of Arkansas, through its Governor, has the authority to agree to the indemnification clause and procure insurance policies for this purpose also purchased with moneys from the Governor's Emergency Fund.
It is my opinion, after a review of the facts and the Agreement, that the State of Arkansas, acting through its Governor, does have the legal authority to enter into the Agreement, assuming there are sufficient appropriated funds in the Governor's Emergency Fund, assuming the "review" of the Governor's Emergency Fund Review Committee is obtained, and assuming valid insurance in the amount represented (five million dollars) is secured covering each of the specific items listed in the indemnification clause. A discussion of the issues is set out below.
The first question for resolution involves the State's authority (specifically the Governor's authority) to "donate" or provide funds to the federal Fish and Wildlife Service to keep open a national wildlife refuge which would otherwise be closed due to a federal government shutdown. Two issues arise in this regard. The first is the authorized uses of the Governor's Emergency Fund. That fund is governed by A.C.A. §19-2-404 (Repl. 1994), which provides in pertinent part as follows:
 (a)(1) In the event of riots or threatened riots; sabotage, public insurrection, or threatened insurrection; storm, flood, famine, or other public calamity which jeopardizes the public peace, health, and safety of citizens of Arkansas that calls for immediate action, the Governor is delegated and authorized by the General Assembly to declare an emergency to exist and to issue a proclamation declaring an emergency to exist.
 (2) Other requests for utilization of this appropriation shall be submitted for prior review by the Governor to a Governor's Emergency Fund Review Committee, meeting in committee, composed of the chairmen and vice chairmen of the Legislative Joint Auditing Committee and Legislative Council. [Emphasis added.]
It appears that the statute above contemplates two types of uses of the funds appropriated. Subsection (a)(1) contemplates true "emergencies" of the nature specified in that subsection. Subsection (a)(2) refers to "other requests" for use of the funds, and requires the review of the Committee. It appears, therefore, that the use of the Governor's Emergency Fund, at least under subsection (a)(2), is not strictly limited to the types of emergencies enumerated in subsection (a)(1), assuming of course, review of the Governor's Emergency Fund Review Committee. It appears that the use of such funds, with the review of the Committee, is discretionary with the Governor. It is therefore my opinion, assuming this review, that you may, in your discretion, lawfully use your "Emergency Fund" to provide funds to the Service for the purposes described.
A broader question which arises with regard to the donation or provision of funds is the constitutional or statutory power of the State in general (or the Governor in particular) to donate or provide state money to an entity of the federal government to keep open a wildlife refuge, presumably for the purposes of ensuring a successful waterfowl hunting season and all the concomitant economic benefits flowing to the affected area of the State during such season. The first constitutional provision which should be noted in this regard, although in my opinion it poses no impediment to the action suggested, is Arkansas Constitution, art. 12, §12, which provides that:
 Except as herein otherwise provided, the state shall never assume or pay the debt or liability of any county, town, city, or other corporation whatever, or any part thereof, unless such debt or liability shall have been created to repel invasion, suppress insurrection or to provide for the public welfare and defense. Nor shall the indebtedness of any corporation to the state ever be released or in any manner discharged save by payment into the public treasury.
The provision above does not specifically prohibit assuming or paying the debts of the federal government, and the phrase "or other corporation whatever" has been construed to apply only to private corporations or those engaged in private enterprises. Ruff v. Womack, 174 Ark. 971,298 S.W.2d 222 (1927). It is thus my opinion that this provision stands as no impediment to the action suggested.
One other constitutional provision that should be mentioned is Amendment35 to the Arkansas Constitution which creates and empowers the Arkansas Game and Fish Commission. An argument might be made that the Governor's attempt to provide funds and enter into an agreement with the Service in some way usurps the constitutional authority of the Game and Fish Commission to regulate wildlife in the State. Additionally, a challenge might be made to the use of the Governor's Emergency Fund moneys as an unconstitutional attempt to provide other state moneys for Game And Fish Commission purposes in contravention of the prohibition of Amendment 35, § 8 against appropriating any moneys to the Game and Fish Commission other than those credited to the "Game Protection Fund." In my opinion neither of these potential challenges is tenable. It has been held by the Arkansas Supreme Court that the Game and Fish Commission's constitutional authority does not extend to the use of its eminent domain powers to acquire land for public duck hunting grounds. See Arkansas Game and FishCommission v. Gill, 260 Ark. 140, 538 S.W.2d 32 (1976) and Hampton v.Arkansas State Game and Fish Commission, 218 Ark. 757, 238 S.W.2d 950
(1951). The rationale of both cases is to the effect that the Commission's powers and duties are more in the nature of fostering conservation than providing access to hunting. Thus, in my opinion, the Governor, in attempting to protect and foster waterfowl hunting during this period of federal government shutdown, is not usurping any authority of the Arkansas Game and Fish Commission under Amendment 35. In the alternative, the purposes of this Agreement can also be seen as to protect the economic interests of the area by fostering tourism. The Governor has authority in this area, and in exercising this authority is not usurping any authority of the Arkansas Game and Fish Commission. For the same reasons, the use of Governor's Emergency Funds is not an attempt to supplement the Game and Fish Commission's restricted funding.
The next issue for resolution involves the Governor's authority to sign the Agreement in light of Article II.3.B. (the indemnification clause set out earlier in this opinion). As was noted earlier, in my opinion Arkansas Constitution, art. 12, § 12 stands as no impediment to the State "assuming" the liabilities of the federal government in this manner. It is also my opinion that no other constitutional or statutory provision is violated by virtue of the signing of such an indemnification, provided sufficient insurance is obtained to insulate the State from foreseeable liability. There will, in my opinion, be no violation of Arkansas Constitution, art. 5, § 20, which prohibits the State from being made a defendant in any of her courts, because, under the facts outlined, the State will not be made a defendant in any of her courts. The State is merely agreeing to indemnify the federal government, through a policy of insurance, in the event the federal government is made a defendant in federal court or incurs any liability for the items mentioned in the indemnification.
In addition, because a policy of insurance is being utilized to cover the potential liability of the State with regard to this indemnification, in my opinion no problem is created under the debt restriction provisions of Amendment 20, which prohibits the issuance of bonds or other evidences of indebtedness pledging the full faith and credit of the State or any of its revenues without a vote of the electorate. A similar question was addressed by the Attorney General of New Mexico in an Opinion dated December 22, 1995 with reference to the State of New Mexico paying for the continued operation of Carlsbad Caverns. The New Mexico Attorney General concluded that in light of the insurance policy covering potential liability of the state, "the exposure of the State dwindles to such a de minimus level, that it can be considered not significant from the standpoint of the prohibition of debt provision of the State Constitution." Op. NMAG dated 12-22-95 at 5. The New Mexico Attorney General came to this conclusion in light of the claims history of Carlsbad Caverns and the risk of liability exposure to the State of New Mexico. The liability policy procured there was a five million dollar policy per occurrence and in the aggregate. It is my opinion, similarly, assuming such an insurance policy, that the language of Amendment 20 to the Arkansas Constitution is not violated by the Agreement.
In conclusion, assuming sufficient appropriated moneys are available in the Governor's Emergency Fund, assuming a "review" of the expenditure by the Governor's Emergency Fund Committee, and assuming adequate insurance is obtained, it is my opinion that the State (specifically the Governor) has the legal authority to enter into the agreement, which includes the provision of funds to the Service and the indemnification of losses incurred.
Sincerely,
WINSTON BRYANT Attorney General
WB/cyh
[1] Although the Agreement would characterize the State's payments as donations, it is my view that such payments likely would be found by a court to be in the nature of fees for services rendered by the Service (i.e., the reopening and operation of the Refuge). I do not, therefore, anticipate that the Agreement would be held invalid for lack of consideration.